IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 6, 2009

## STATE OF TENNESSEE v. JOSEPH MAY

**Direct Appeal from the Criminal Court for Shelby County**
**No. 04-03616     Carolyn Wade Blackett, Judge**

---

**No. W2006-02479-CCA-R3-CD  - Filed June 8, 2009**

---

The defendant, Joseph May, was convicted by a Shelby County jury of first degree premeditated murder for which he received a sentence of life imprisonment. On appeal, he contends that the evidence was insufficient to prove he committed a premeditated and intentional murder.  Upon review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J.C. McLin, J., delivered the opinion of the court, in which Alan E. Glenn and Camille R. McMullen, JJ., joined.

Garland Ergüden (on appeal), and Amy Mayne and William Johnson (at trial) Assistant Public Defenders, Memphis, Tennessee, for the appellant, Joseph May.

Robert E. Cooper, Jr., Attorney General and Reporter; Melissa Roberge, Assistant Attorney General; William L. Gibbons, District Attorney General; and Paul Hagerman and Lara Fowler, Assistant District Attorneys General, for the appellee State of Tennessee.

## OPINION

### FACTUAL BACKGROUND

The evidence presented at the trial established that the victim, Tonya Turnage, died after having been hit over the head with a glass bottle and stabbed multiple times by the defendant.  On the morning of January 14, 2004, the victim's body was discovered by Ursula Leflore.  Ms. Leflore testified that while she was delivering newspapers, she discovered a body, which was later identified as the victim, lying face down in the street at the intersection of Dunn and Dearing.  Ms. Leflore immediately left the intersection and called the police to report the body.  At the trial, Ms. Leflore identified photographs of the victim's body taken at the location where she was found.

Michael Rawlins with the Memphis Police Department testified that at approximately five o'clock in the morning on January 14, 2004, he responded to "a man down call."  Upon arriving at

the intersection of Dunn and Dearing, he "observed a female body in the middle of the street . . . and a lot of blood . . . around the body." Officer Rawlins checked the body and found it was cold and had no pulse. Photographs depicting the scene and the body surrounded by blood were identified by Officer Rawlins and made exhibits at the trial.

David Galloway with the Memphis Police Department Crime Scene Unit stated that on January 14, 2004, he responded to a crime scene call at the intersection of Dunn and Dearing in Memphis, Shelby County. His duties as a crime scene officer were to capture the scene through photographs and sketches and to collect evidence. He recalled that when he arrived at the scene, a clothed body was lying in the street and "what appeared to be blood was coming from different parts of her body." Officer Galloway identified his sketch of the scene which was made an exhibit at the trial. The body was found without shoes, a purse, or identification. Photographs depicting clothing and jewelry worn by the victim and injuries to the victim's arm, side, and hand were taken by Officer Galloway and identified by him at the trial. On cross-examination, Officer Galloway described the neighborhood where the body was found as residential with mostly single family houses.

Sergeant T.J. Helldorfer with the Homicide Bureau of the Memphis Police Department testified that on January 18, 2004, he was assigned to advise Joseph May of his *Miranda* rights before he gave a statement. Sergeant Helldorfer identified the defendant at trial as Joseph May and also identified an advice of rights form signed by the defendant. Sergeant Helldorfer stated that the form was executed during an interview of the defendant conducted by himself and Sergeant J.R. Howell. After the defendant was advised of his rights, he signed consent forms for the searches of 1318 Briarwood, the defendant's home, and a 1978 Chevy pickup truck, the defendant's vehicle. Sergeant Berryman then took a statement from the defendant while Sergeant Helldorfer interviewed the defendant's mother. Sergeant Helldorfer stated that the defendant and his mother came into the homicide office of their own accord. He recalled that the defendant was calm and reserved.

Nathan Berryman with the Homicide Squad of the Memphis Police Department testified that he assisted Sergeant Helldorfer with the investigation of the victim's death. Lieutenant Berryman stated that the defendant was brought to the homicide office by his stepfather and mother because "he wanted to confess the killing of this victim." After the defendant waived his rights, Lieutenant Berryman spoke with the defendant. Lieutenant Berryman identified a four page written statement signed by the defendant which was made an exhibit and read aloud to the jury. The statement reads in pertinent part:

Sergeant Helldorfer: Do you wish to make a statement now?

The Defendant: Yes.

Sergeant Helldorfer: Are you aware that we are investigating the death of Tonya Turnage?

The Defendant: Yes.

Sergeant Helldorfer: Joe, are you responsible for Tonya's death?

-2-

The Defendant:         Yes, sir.

Sergeant Helldorfer:   Could you tell me in as much detail as possible what occurred before, during and after, Tonya and it says Trudge's – death. Should that be Turnage?

The Defendant:         Yes. That should be. Answer: I like to get high and pick up women[,] on Tuesday night [] I went out. I picked up a woman around the Barron and Semmes area.

                       . . . .

                       I picked her up on the way back to the house and asked her if she liked to get high? So we came to the conclusion that we were going to smoke dope . . . and have sex. We get back to the house. The first thing we do is get high together. Then we have sex, . . . . After that, we continue to get high. About an hour and a half later we got done smoking. She got upset with me. She thought that . . . I [was] going to get her some money for the sex we had. Once I told her that I didn't have any money, she threw a tantrum with me. At this time, we were sitting on the couch in my living room, . . . . At this time she told me that she want[ed] some f***ing money. At this time I told her, I didn't have any money to give her. Now, she's getting really hostile with me. She's screaming at me. I have a knife on my coffee table. She grabbed the knife and begins to up the blade [ ]. And she is to the left of me. I grabbed a bottle and hit her in the head with the bottle. At this time, when I hit her in the head, she fell over. Then she fell over on the knife. I think that she pulled the knife out or it fell out. I'm not really for sure. Then she [got] up and [is] coming at me. She lunges at me and I hit her two more times with the bottle. The third time the bottle broke. Due to us - - both of us being high, it's [sic] nothing slowing her down. She gets back up and [is] wrestling around, there was another knife under the cushions of my couch. I believe at this time I stabbed her in the throat with the knife. After that time, I am scared. I try to put her in the truck. I pull the truck in the garage. I brought her out through the window. I drove around two miles down the street. I think it was Dunn Street. I put her out on the street . . . [b]y the curb. I wipe down my truck and put my clothes in the washing machine. I put a drop cloth over the carpet. When I get back to the house, it is about two a.m.

-3-

According to Lieutenant Berryman, the defendant reported that when he picked up the victim he had "about six rocks" of crack cocaine. The defendant described the knife that the victim grabbed as "a folding knife" and the knife that he pulled from under the couch as "[a] knife with a sheath." The defendant told Lieutenant Berryman that he was unsure how many times he stabbed the victim because they "were scuffling." When asked what he did with the wine bottle that he used to hit the victim, the defendant said that he "threw it in the trash." The defendant was photographed and asked if he had injuries and he indicated that he did not. Lieutenant Berryman described the defendant's demeanor during his interview as calm. On cross-examination, Lieutenant Berryman agreed that if the defendant had not turned himself in, the case would have been very difficult to solve.

Memphis Police Department Officers Merritt, Sousoulas, and Jacobs testified regarding the search of the defendant's residence and vehicle and the recording and custody of the evidence found. Officer Merritt testified that after the defendant signed a consent form for the search of his residence, he went to 1318 Briarwood to conduct the search. Upon entering the house, Officer Merritt noticed that a paint drop cloth covered the entire floor of the living room. The living room furniture was sitting on top of the drop cloth. A substance believed to be blood was found on the living room carpet, items of clothing, shoes, boots, the arm of a love seat, and underneath the middle cushion of the couch. Photographs of the living room included one of a knife in a sheath. Officer Merritt stated that the photograph showed the knife exactly as it was found under the middle cushion of the couch. Officer Merritt stated that samples were taken from the carpet, the couch, a comforter on the couch, and a table. Items were collected from the house including the knife in the sheath and the defendant's shoes. Officer Merritt stated that the defendant's vehicle was taken to a storage lot for a later search. Police did not find the victim's shoes, purse, or identification inside the house.

Officer Sousoulas identified the evidence taken from the house including a knife in a sheath, which was made a trial exhibit. Officer Jacobs testified that he processed and photographed a truck that had been towed from 1318 Briarwood. He stated that in the bed of the truck he found a hatchet with a wooden handle and what appeared to be blood on the tailgate. The hatchet was tagged as evidence and the tailgate was swabbed to be tested for the presence of the victim's blood. On cross-examination, Officer Jacobs stated that there was also a toolbox, assorted oil bottles, a glass bottle, and a spare tire in the bed of the defendant's truck which were not inventoried.

Doreen Shelton with the Memphis Police Department assigned to the Homicide Bureau testified that she was present when a nurse obtained a blood sample from the defendant to compare with the samples found at his residence. Lieutenant Shelton also received samples taken from the victim at the Regional Medical Forensic Center. Blood samples from both the defendant and the victim were identified by Lieutenant Shelton and admitted as trial exhibits. Ernestine Davison with the Memphis Police Department testified that she delivered the blood samples from the victim and the defendant along with other evidence to the Tennessee Bureau of Investigation for analysis.

Sergeant J.M. Oliver with the Memphis Police Department testified that he retrieved a pocket knife contained in a plastic bag from the residence of the defendant's parents in Olive Branch, Mississippi. According to Sergeant Oliver, the defendant's parents told him that "they had handled the knife." The pocket knife was made an exhibit at the trial.

Donna Nelson, a forensic scientist with the Tennessee Bureau of Investigation, testified that the defendant's DNA was identified on rectal swabs taken from the victim. Tests further identified the victim's blood on three living room carpet samples, the fabric sample from the arm of the couch, and a large knife. Tests revealed a partial verification of the victim's blood on samples taken from the defendant's truck. Agent Nelson explained that the partial verification indicated the sample was degraded. Tests failed to reveal the victim's blood on the pocket knife or the hatchet.

Dr. O.C. Smith, Shelby County Medical Examiner, testified that in January of 2004 he performed an autopsy on an individual identified as the victim, Tonya Turnage, a thirty-four year old woman. The autopsy revealed that the victim sustained injuries including multiple stab wounds and cutting wounds to the neck and torso, tears to the scalp, underlying fractures, and bleeding about the brain. The cause of the victim's death was officially listed as "multiple injuries." Dr. Smith stated that there were two tears on the victim's scalp indicating blunt force injuries including a large tear of three and three quarter inches above and behind her left ear, and smaller tears involving the top of the ear. There was another tear on the back of the victim's head caused by a blunt force. The victim's blood was tested for both cocaine and metabolite, a breakdown product of cocaine. Tests revealed that the victim's blood levels of both cocaine and its metabolite were in the upper range for recreational use of cocaine. Dr. Smith testified that "[n]ormal recreational use would be .1, sometimes .2 and [the victim's level was] .255."

According to Dr. Smith, there were scrapes and tears from the victim's lip to her right check and the bridge of her nose consistent with "road rash." Dr. Smith explained that "road rash" was most often seen when a body had suffered forced contact with pavement, gravel, or concrete. Sharp force injuries of two types were present on the victim's neck. The first type of wound was superficial, going down only to the protective layer covering the neck muscles and was inflicted using a slicing motion. The second type of sharp force injury was a stab wound caused by the insertion of a sharp object "into the neck and in an upward direction . . . causing damage to the carotid artery and the jugular vein, cutting across the windpipe." Dr. Smith explained that this injury would have "cause brisk bleeding" and would also have caused the victim "to breathe blood into her lungs." Dr. Smith estimated that there were two passes with a knife on the right side of the victim's neck and three passes with a knife on the left side of her neck. There was also a shallow stab wound with skin scrapping and bruising found on the victim's right forearm and two incised wounds on the victim's right middle finger. Dr. Smith stated that there were five stab wounds to the victim's abdomen and chest which resulted in damage to her lungs and liver.

Without knowing the exact sequence of events, it was difficult for Dr. Smith to determine the order that the injuries were received. However, he stated, with the exception of some tears inside the victim's lip, all of the injuries appeared to have occurred while the victim was alive. Dr. Smith specifically testified that the scraping injuries on the victim's head and face occurred while the victim was still alive. Dr. Smith agreed that the wounds on the victim's arm and finger were consistent with "defensive wounds." However, he clarified that the term "defensive wound" evolved as "a term of art in forensics" from seeing injuries that had occurred in an attempt to deflect a sharp edge. Dr. Smith stated the term was not a diagnostic criterion. Photographs taken during the autopsy of the victim were entered into evidence as trial exhibits.

On cross-examination, Dr. Smith stated that an examination of the victim indicated that there was not any trauma or forced entry during sex. He stated that he believed that the wounds to the torso were "more likely to have been inflicted by the smaller knife[.]" The area of the brain that would have been affected by blunt trauma injuries to the victim's head "were not those areas that would require a person to either lose consciousness or lose control of their body." Dr. Smith agreed that the use of cocaine affected everyone differently "within certain guidelines." He further agreed that the use of cocaine could affect a person's judgment, temperament and overall personality and could cause agitation and create a drive to get more cocaine. On redirect examination, Dr. Smith agreed that the wounds to the torso could not have been caused by the victim falling on a knife, nor could the injuries to the neck have been caused by only one stabbing.

Carol Turnmire, the defendant's mother, testified that she and her husband owned the house on Briarwood and that the family had lived there until they moved to Mississippi. After she and her husband moved, the defendant and Ms. Turnmire's daughter continued to live in the house on Briarwood. Ms. Turnmire recalled that in 1998, she discovered that the defendant was on crack and "taking Oxycotin and several other things." The defendant entered a drug rehabilitation center in Mississippi. After the defendant left the rehabilitation center, he moved to New Albany with his wife in an effort to reconcile their marriage. However, in 2000, the defendant and his wife separated and he moved back into the Briarwood house with his girlfriend and lived there intermittently from 2000 to 2004. Ms. Turnmire stated that the last time that the defendant moved back into the house on Briarwood, he had been living with his girlfriend who "kicked him out of the house because of drug use." Ms. Turnmire knew that the defendant was still having a drug problem and spent his entire weekly paycheck of five to six hundred dollars on crack cocaine. She and her husband had allowed the defendant to move back into the house on Briarwood and the defendant had agreed to help get the house ready to sell.

Ms. Turnmire spoke with the defendant on the telephone on Monday night, January 12th or 13th, 2004. On the following Thursday, after Ms. Turmire had not been able to reach the defendant, she drove by the house on Briarwood, but she did not see his truck. On Friday, Ms. Turmire and her husband went to the house and knocked for a long time, and the defendant finally came to the door. As Ms. Turmire stepped into the house, she saw a drop cloth on the living room floor and she thought that the defendant had started doing work to sell the house. The defendant did not look well and Ms. Turnmire told him she was taking him to her house in Mississippi. She and her husband then picked up the defendant's son, who lived around the corner, and they spent Saturday in Mississippi. On Sunday, the defendant told Ms. Turnmire that "he killed the girl that they found on Dearing." The defendant told her that he "picked [the victim] up and I took her back to the house and we were smoking crack and we got into a fight over the crack and it was crazy and things were crazy and I stabbed her." The defendant agreed to go to the police and Ms. Turnmire, her husband and her daughter took him to the police station where he gave a statement. Ms. Turmire also gave a statement and asked the police to put the defendant on suicide watch because he was so upset. On cross-examination, Ms. Turnmire stated that she first became aware that the defendant kept a large knife at the house about three years ago when someone tried to break into the house.

The defendant testified that he was twenty-nine years old, had two children, and had been employed doing residential fire and water damage repair work. He first used crack cocaine when

he was eighteen years old, and by the end of 2002 to 2003, he "got really strung out on crack." In June of 2003, he spent "five days in detox" followed by "thirty days in rehab." However, within four or five months, he "was back on it again." According to the defendant, he started picking up prostitutes in 1998, and since then, he had been using prostitutes on a weekly basis. The defendant moved back into the house on Briarwood on December 26, 2003, after a fight with his girlfriend. At that time, he was using crack cocaine on a daily basis. The defendant bought the crack cocaine from a "guy that [the defendant] had known, [and] had been dealing with since 2000."

The defendant stated that on the night of his encounter with the victim, he was at his house by himself, had some dope and was lonely. He went to an area where he knew there to be prostitutes and "picked up one prostitute but . . . she didn't want to go back to the house and smoke dope[.]" The defendant then saw the victim. He claimed that the victim flagged him down and he propositioned the victim and told her "there wasn't no money involved." According to the defendant, "the stipulation was [they] would go back to the house, smoke the dope, and have a little fun sex, and [he] would bring her back." The defendant stated that the victim agreed and they went to his house and "got a little high. And [they] had sex. Then [they] started getting high again[.]" At about eleven thirty that evening, the victim became agitated when the defendant "ran out of dope." The defendant stated that "at that point, she had asked [him] for some money." He told the victim that he did not have any money, and "she reached down to the coffee table and grabbed the pocket knife." The defendant said that when "she went for that pocket knife . . . [he] struck her with the bottle[,]" hitting her two or three times before the bottle broke. He recalled that the victim fell to the floor and got up and they were "squalling" when he fell and she fell on top of him. The defendant stated that he then "grabbed the knife from the cushion and [he] stabbed her with it." The defendant stated that the knife was from his knife collection, and that it had been under the cushion since he moved back into the house. The defendant could not recall how long the fight lasted. His testimony regarding what happened after stabbing the victim continued as follows:

| Defendant: | I didn't have no phone in the house. I didn't have no cell phone. It wasn't an option for me to pickup 9-1-1 and call them. Really, I freaked out. . . . I'm seeing Tonya there. She's lifeless, I didn't . . . check for a pulse. I didn't check to see if she was dead. |
|---|---|
| | . . . . |
| Counsel: | Did she look dead to you . . . . [Y]ou didn't check for a pulse[?] |
| The Defendant: | No, she was actually . . . turned away from me on the floor. She wasn't moving. . . . I suppose she was lifeless. I didn't check. I couldn't tell you. |
| Counsel: | Were you still high on crack cocaine at this point? |

-7-

| | |
|---|---|
| The Defendant: | Yes, ma'am. I was still coming down off the aftermath[] of crack. |
| Counsel: | And what did you do next? |
| The Defendant: | Like I said, I got scared. I didn't know what to do. So I made a decision, I mean it wasn't a logical decision, I just made a decision that I was going to place her in the truck and place her somewhere where somebody could find her and that's what I did. I didn't even drive that far from the house. It wasn't even – less than two miles from where I lived at and I placed her there in the street. I mean, you know, that I jumped out the truck and I ran and yanked her out and bawled off, you know, I mean – I wasn't trying to hide her. I didn't -- you know, I didn't think about putting her in a dumpster. It was a logical place for me to do it so somebody would find her and maybe get medical attention if she was still alive or what – you know, it was just - - |
| Counsel: | Do you have any idea what time it was at this point? |
| The Defendant: | I had no clock at the house. I got an alarm clock, but I believe it wasn't set right. I could tell you, it was probably, give or take, one or two o'clock in the morning. |
| Counsel: | And so the street lights were on in that area. Was it a well lit area or dimly lit or do you recall? |
| The defendant: | As I recall, it was a lighted area. You know, I have lived on that street when I was a kid. I was familiar with the area and there was a church right there. But the church is right here across the street, and that's the street there, and that's where she was found. I – you know, I believe it was a very lit area, it wasn't total darkness. |

The defendant stated that he then went home and lay down on the couch. He recalled that he was supposed to be at work and his team leader came by the house and knocked on his door. The defendant did not let his team leader in the house because "of what was on the floor there, the blood." The defendant told the team leader he was not coming to work. After his team leader left, the defendant put a tarp over the carpet and wiped off the knife. He stated that he "got some dope that Thursday, and [he] got high," and on Friday, he went "to work to get [his] paycheck because [he] wanted to get high." The defendant recalled that later on Friday, his parents came by the house and told him they were going to get his son and take them to Mississippi. On Sunday morning while he was in the car with his mother, he told her that he was "responsible for that woman they found

-8-

on Dearing and Dunn." The defendant stated that although he was scared, he "came in voluntarily and [he] told them what – what had happened."

On cross-examination, the defendant agreed that in his statement to the police, he said nothing about wanting the victim to have medical attention, but stated that he did not have an attorney present and just gave the police a summary of what happened. The defendant stated that he hit the victim on the side of the head with the bottle as she was coming toward him with a knife and then hit her a second time on the back of the head as a reaction after the first swing. The defendant agreed that he told the police that he did not have any injuries. The defendant further agreed that he made the decision not to take the victim out the front door, but instead, took her out the window into the garage to avoid being seen. He conceded that he put the victim in the truck and left her body in the street. When asked if the victim was still alive when he left her body in the street, the defendant stated he "had no idea that she was or was not," but claimed it was his intention that someone find her and get her medical attention. On redirect examination the defendant stated that he turned himself in because he knew he was responsible for what happened to the victim and for his decisions, and stated he "couldn't live with [himself]."

The jury was instructed on first degree murder and lesser-included offenses and on self-defense. After deliberation, the jury found the defendant guilty of first degree murder. Thereafter, he was sentenced to life imprisonment.

ANALYSIS

On appeal, the defendant challenges the sufficiency of the convicting evidence. Specifically, the defendant argues that the state did not "carry its burden of proving that he is guilty beyond a reasonable doubt of premeditated and intentional murder." The defendant submits that "the evidence is insufficient to support a conviction greater than murder in the second degree."

We begin our review by setting forth the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *see also* Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *State*

*v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

First degree murder is defined as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A premeditated killing is one "done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). Premeditation is explained as follows:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id*. An intentional act requires that the person have the desire to engage in the conduct or cause the result. *Id*. § 39-11-106(a)(18). Whether premeditation is present is a question of fact for the jury, and it may be determined from the circumstances surrounding the killing. *Bland*, 958 S.W.2d at 660; *State v. Anderson*, 835 S.W.2d 600, 605 (Tenn. Crim. App. 1992). Circumstances that may be indicative of premeditation include declarations of the intent to kill, procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, infliction of multiple wounds, the making of preparations before the killing for the purpose of concealing the crime, destruction or secretion of evidence, and calmness immediately after the killing. *State v. Jackson*, 173 S.W.3d 401, 409 (Tenn. 2005); *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000). A defendant's failure to render aid to a victim can also indicate the existence of premeditation. *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

Viewed in a light most favorable to the state, the evidence revealed that the victim died of multiple injuries brutally inflicted by the defendant. The defendant stabbed the victim numerous times causing wounds to her neck and body. Dr. Smith stated the wounds to the victim's neck indicated two to three passes of a knife on each side in addition to deeper wounds injuring her jugular vein, carotid artery and windpipe. According to Dr. Smith, the victim's injuries also included blows to her head with a blunt object, wounds to her torso injuring her liver and lungs, injuries to her arm and finger consistent with an attempt to deflect a sharp object, and "road rash" consistent with forced contact with pavement. Dr. Smith further testified that the stab wounds could not have been caused by the victim falling on a knife and the stabbing wounds, head trauma injuries and "road rash" were inflicted while the victim was still alive.

The evidence also showed that after the defendant attacked and fatally injured the victim, he made no effort to assist her or render aid. Instead, the defendant tried to hide and destroy the evidence of his crime. The defendant removed the victim from his residence by putting her out of a window into the garage. After putting the victim in the bed of his truck, the defendant deposited her body in the street. The defendant then returned to his residence, wiped down his truck, washed his clothes, and placed a drop cloth over the blood in his living room. Later, when the defendant's team leader came by his residence, the defendant did not allow him into the house because of the

blood. The defendant's attempts to hide the evidence, the brutality of the defendant's attack on the victim, the multiple wounds inflicted, and the defendant's abandonment of the victim in a deserted street support a finding of an intentional and premeditated killing. In our view, a rational jury could infer that sufficient evidence exists to support the defendant's conviction.

## CONCLUSION

Based on the foregoing, we affirm the conviction and sentence of the defendant.

_____
J.C. McLIN, JUDGE