IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
February 2, 2010 Session

**STATE OF TENNESSEE v. TELLY SAVALAS JOHNSON**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 06-09031     Chris Craft, Judge**

—————————

**No. W2009-00764-CCA-R3-CD  - Filed August 17, 2010**

—————————

A Shelby County jury convicted the defendant, Telly Savalas Johnson, of five counts of criminal attempt to commit first degree murder.  The trial court sentenced him as a Range I standard offender to an effective sentence of seventy-five years in the Tennessee Department of Correction.  On appeal, the defendant argues that the evidence at trial was insufficient to prove identity and premeditation.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which JERRY L. SMITH and CAMILLE R. MCMULLEN, JJ., joined.

Harry E. Sayle, III (at trial and on appeal), and Robert T. Hall (at trial), Assistant Public Defenders, Memphis, Tennessee, for the appellant, Telly Savalas Johnson.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; William L. Gibbons, District Attorney General; and Alanda Dwyer and Marianne Bell, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Background**

    On November 16, 2006, the Shelby County Grand Jury indicted the defendant, Telly Savalas Johnson, on five counts of criminal attempt to commit first degree murder.  The parties presented the following evidence at the defendant's November 2008 jury trial.

Tiffany Perkins, formerly Tiffany Qualls, testified that on June 26, 2006, she and Toriano Perkins, Sr., who at that time was her fiancé, went to pick up his children at his mother's house at approximately 5:00 p.m. His three children were eleven, nine, and five years old. On their way home, Mrs. Perkins stopped her Astro van at the stop sign on the corner of Hunter Avenue and Evergreen Street and observed "a lot of people" on both sides of the street and on the hill at the end of the street. She saw the defendant, whom she identified in the courtroom, and a woman named Michelle, also known as Big Mike among the people. Mrs. Perkins testified that she had known the defendant since she was eleven years old, and she had gone to school with his sister. She said that she had never had problems with the defendant. Mrs. Perkins testified that when she stopped at the corner, she heard Michelle say, "'there's children in that car[,]'" and the defendant responded, "'f--k that s--t,' or 'f--k those kids.'" In the rear-view mirror of the van, she saw the defendant "juggling with" something. She said that he walked from behind the van to the right side. By the time he reached the right side, she could see a pistol in his hand. He began shooting before she was able to drive away. Mrs. Perkins testified that he shot out the back window, and she had to duck when a bullet went through the front window. She said that he fired five to six shots. She drove to a police sub-station, but it was closed. At that point, she realized that the defendant had shot J.P.[1], Mr. Perkins's youngest daughter, in the leg and that broken glass had cut the other two children. Mrs. Perkins then drove to Mr. Perkins's mother's house and called 9-1-1 en route. They arrived at the house immediately prior to the police. An ambulance arrived a short time thereafter. The ambulance transported J.P. to Le Bonheur Children's Medical Center, where she stayed for approximately twelve hours. Mrs. Perkins accompanied her and only left the hospital to give her statement to police. The investigators showed her a photospread from which she identified the defendant as the shooter. She testified that she was "one[-]hundred percent positive" that the defendant was the person who shot J.P.

Officer Joseph Hall Giannini, a crime scene investigator with the Memphis Police Department, testified that he responded to a shooting call at the corner of Hunter Avenue and Evergreen Street. He observed four .380 auto shell casings and a bullet fragment on the ground. Officer Giannini processed Mrs. Perkins's van, which she had parked at 1794 Hunter Avenue. He observed two apparent bullet holes in the rear cargo door, one through the glass and one on the lower part of the door. The bullet that entered the outside of the cargo door exited the door inside the vehicle. He found a bullet fragment in the cargo area of the van. Officer Giannini collected all of the casings and fragments as evidence.

Lieutenant Jessica C. Burton, with the Memphis Police Department's Felony Response Bureau, testified that she responded to a shooting on June 26, 2006, at 1794 Hunter

---

[1] It is the policy of this court to refer to minor victims by their initials.

Avenue. When she arrived, the ambulance had already transported J.P. to the hospital. She interviewed Toriano Perkins, Sr., and his son, T.P. T.P. identified the defendant in a photospread as the person who shot his sister.

T.P. testified that he was twelve years old at the time of trial. He was nine years old on the day that his sister, J.P., was shot. He said that they were on their way home from their grandmother's house and were about to turn when he heard a man say, "'stop, stop.'" Then, he heard someone say that there were children in the car. The defendant said, "'F' them kids" and began shooting. T.P. testified that the defendant fired five times. He said that he did not see the person fire the shot or pull out the gun, but he saw the defendant come out of the crowd. He pointed out the defendant in the courtroom and said that he was "kind of sure" that he was the person who came out of the crowd and shot his sister. T.P. identified the photospread that Lieutenant Burton showed him and on which he circled the defendant's picture.

D.P. testified that she was thirteen years old at the time of trial. She recalled that on the day J.P. was shot, her family had just left their grandmother's house. They were turning a corner when a "man . . . jumped out of [nowhere]" and began shooting. D.P. said that she heard someone say, "'It's [sic] children in this car," and the defendant said, "'F those children.'" She saw the defendant raise his gun and shoot five times. She said that he was running behind the van as he was shooting. D.P. said that they drove to a police station. Her sister's leg was bleeding, and she could see the bullet hole. She thought that her brother had also been shot, but he just had an asthma attack. The family went back to her grandmother's house. An ambulance took her sister away, and the police took the rest of the family to a station to give their statements. D.P. identified the defendant in a photospread as the shooter. She was unable to identify him at a hearing prior to trial.

J.P. testified that she was five years old when she was shot. Her family had just left her grandmother's house, and she was sitting behind her father. She realized something was wrong when she got shot. J.P. first said that she did not see the person who shot her but later said that she knew she had been shot because "[she] saw him pull out a gun and saw him shoot."

On cross-examination, J.P. said that she was not sure whether she saw the shooter.

Mark Lewis, a firefighter and paramedic with the Memphis Fire Department, testified that on June 26, 2006, he received a call from dispatch of a gunshot wound on Hunter Avenue. He arrived after the police. An officer pointed him towards a van, where J.P. was sitting on the bumper. J.P. was calm and showed him that she was wounded on the inner side

of her left thigh near her knee. The bullet had exited her leg, and there was little bleeding. He treated the wound and took her to Le Bonheur Children's Medical Center.

On cross-examination, Mr. Lewis testified that J.P.'s wound was not life threatening.

Toriano Perkins, Sr., testified that on June 26, 2006, he and Mrs. Perkins had gone to his mother's house on Hunter Avenue to pick up his three children and were returning to their home when they stopped at the corner of Evergreen Street and Hunter Avenue. Mrs. Perkins was driving, and he was sitting in the passenger seat of their mini-van. He testified that some of the windows in the van were down and that the other windows were clear and easy to see through. When they stopped at the intersection, he heard a woman he knew as Big Mike say, "'Telly there are children in the van[.]'" Mr. Perkins said that the defendant either responded, "'F--k that s--t[']' or [']f--k those kids[]'" Mrs. Perkins yelled that someone was about to shoot them. He turned around and saw the defendant behind the van with a pistol. Mr. Perkins testified that his wife turned onto Evergreen Street, and the defendant ran behind the van, shooting. Mr. Perkins said that the defendant fired approximately five times. After they drove away from the intersection, they went to a police precinct. On the way, T.P. had an asthma attack, and Mr. Perkins at first thought that T.P. had been shot. Mr. Perkins did not realize that J.P. was injured until they reached the precinct, and she told him that her leg was bleeding. Because there was no one at the precinct, they returned to his mother's house. Mr. Perkins said that they drove back through the intersection at Hunter Avenue and Evergreen Street and did not see the defendant. The police arrived at his mother's house at the same time they did. Mr. Perkins identified the defendant in the courtroom as the man who shot at them. He said that he knew the defendant because they grew up in the same neighborhood. He had seen the defendant from a distance approximately a month before the shooting, and before that, it had been years since he had seen him. Mr. Perkins did not know of any problems between the defendant and Mr. Perkins's family. When Mr. Perkins spoke with investigators, he told them the defendant's first name because he did not know his last name. He identified the defendant from a photospread as the person who shot at his van.

Detective Stephen Roach, of the Memphis Police Department Felony Assault Unit, testified that he was the case coordinator investigating the June 26, 2006 shooting of J.P. Detective Roach testified that he received several crime stoppers tips that identified the shooter by the nickname Tello. He sent flyers to police precincts with the defendant's name, description, and picture. During the course of the investigation, Detective Roach learned of several possible addresses for the defendant but was unable to locate him. He did not locate any witnesses to the shooting nor anyone who could provide information. Detective Roach testified that a court issued a warrant for the defendant's arrest on June 30, 2006. Several days later, he learned that the defendant was in custody.

-4-

Memphis Police Officer Willard Tate testified that on July 4, 2006, he received information that the defendant was in a vacant house at the corner of Evergreen Street and Hunter Avenue. Two officers entered the house, and the defendant fled on foot. The officers lost track of the defendant in a housing development, but Officer Tate noticed footprints leading into a garage. He and his partner entered the garage and discovered the defendant lying on a couch underneath blankets with his right arm out. Officer Tate grabbed the defendant's arm, and the defendant struggled with him until another officer sprayed a chemical agent at the defendant. The officers were then able to handcuff the defendant.

Following deliberations, the jury found the defendant guilty as charged on all counts. The trial court held a sentencing hearing on January 21, 2009. The court sentenced the defendant to twenty years each for the attempted murders of J.P., D.P., and T.P., and to fifteen years each for the attempted murders of Tiffany Perkins and Toriano Perkins, Sr. The court ordered the defendant to serve the twenty-year sentences consecutively and to serve the fifteen-year sentences concurrently with each other and consecutively to the three twenty-year sentences, for an effective sentence of seventy-five years in the Tennessee Department of Correction.

## Analysis

On appeal, the defendant challenges the sufficiency of the evidence supporting his convictions. Specifically, he contends that the state did not prove identity or premeditation beyond a reasonable doubt.

Our review begins with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558; *Tuggle*, 639 S.W.2d at 914. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not

attempt to re-weigh or re-evaluate the evidence. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002); *Bland*, 958 S.W.2d at 659. Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *See State v. Elkins*, 102 S.W.3d 581, 582 (Tenn. 2003); *Reid*, 91 S.W.3d at 277.

First degree murder is defined as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A premeditated killing is one "done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). Premeditation is explained as follows:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* An intentional act requires that the person have the desire to engage in the conduct or cause the result. *Id.* § 39-11-106(a)(18). Whether premeditation is present is a question of fact for the jury, and it may be determined from the circumstances surrounding the killing. *Bland*, 958 S.W.2d at 660; *State v. Anderson*, 835 S.W.2d 600, 605 (Tenn. Crim. App. 1992). Circumstances that may be indicative of premeditation include declarations of the intent to kill, procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, infliction of multiple wounds, the making of preparations before the killing for the purpose of concealing the crime, destruction or secretion of evidence, and calmness immediately after the killing. *State v. Jackson*, 173 S.W.3d 401, 409 (Tenn. 2005); *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000). A defendant's failure to render aid to a victim can also indicate the existence of premeditation. *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

In cases where the defendant has been charged with the attempted commission of a crime, there must be evidence that the defendant acted "with the kind of culpability otherwise required for the offense[]" and acted "with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" Tenn. Code Ann. § 39-12-101(a) and (a)(2). Criminal attempt also occurs when the defendant "acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." *Id.* at § 39-12-101(a)(3).

Viewed in the light most favorable to the state, the evidence at trial established that the defendant shot approximately five times at the Perkins family while they were attempting to drive away. As for proof of identity, both Mr. and Mrs. Perkins unequivocally identified the defendant in the courtroom and in photospreads as the shooter, and two of the children identified the defendant in photospreads on the same day as the shooting. The determination of identity is a question of fact for the jury to determine after consideration of all the evidence. *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993). Based on the witnesses' testimony, we conclude that there was sufficient evidence for any rational juror to find that the defendant was the shooter beyond a reasonable doubt. Premeditation, like identity, is a factual question for the jury. *See Bland*, 958 S.W.2d at 660; *Anderson*, 835 S.W.2d at 605. We conclude that the evidence that the defendant fired five times at an unarmed family with no provocation, after a bystander admonished him that children were in the vehicle, was sufficient for any rational juror to find that the defendant acted with premeditation. Accordingly, we conclude that the evidence was sufficient to sustain the defendant's convictions. Therefore, the defendant is without relief in this matter.

**Conclusion**

Based on the foregoing reasons, we affirm the judgments of the trial court.

_____
J.C. McLIN, JUDGE