IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs January 5, 2011

## STATE OF TENNESSEE v. WILLIAM CRAYTON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 08-07626     Lee V. Coffee, Judge**

_____

**No. W2009-02573-CCA-R3-CD  - Filed January 13, 2012**

_____

A Shelby County jury convicted the defendant, William Crayton, of criminal attempt to commit first degree murder, a Class A felony.  The trial court sentenced him as a repeat violent offender to life without parole in the Tennessee Department of Correction.  On appeal, the defendant challenges the sufficiency of the evidence to support his conviction and argues that the trial court erred by not dismissing the second count of the indictment, employing a firearm during the commission of a dangerous felony, prior to trial.  Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Robert Wilson Jones, District Public Defender; Barry W. Kuhn, Assistant Public Defender (on appeal); and Constance Barnes and Tim Albers, Assistant Public Defenders (at trial), for the appellant, William Crayton.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; William L. Gibbons, District Attorney General; and Chris Lareau, Assistant District Attorney, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

On December 2, 2008, a Shelby County Grand Jury indicted the defendant, William Crayton, for criminal attempt to commit the first degree murder of Orlando Warren, a Class

A felony, and employing a firearm during the commission of a dangerous felony, a Class C felony. The parties tried the matter before a jury in October 2009.

At trial, the victim testified that he had known the defendant for approximately six weeks before February 21, 2008. They worked together at a junkyard. The victim characterized his relationship with the defendant as a friendship. The night of February 20, the defendant went to the victim's residence to take a shower and for the victim to give him a haircut. The victim said that he also gave the defendant blankets to take with him. The defendant spent the night at the victim's residence because the victim did not want to drive him back to the junkyard, where he lived in a trailer on the lot. The morning of February 21, 2008, the victim and the defendant arrived at work separately. The victim testified that when he arrived at the junkyard, the defendant and a man named Helmut, who occasionally worked at the junkyard, were "having words." The victim said that the defendant was accusing Helmut of letting people steal tools from the defendant. Helmut was crying, so the victim told the defendant to leave him alone. The victim and the defendant left the junkyard together to get coffee and to get a part for a tow truck. They talked about the defendant's plan to finish working on the tow truck. When they returned to the junkyard, the victim began working on a van that he was disassembling, and the defendant went to the tool shed and sat on a bucket outside of the shed. The victim testified that while he was underneath the van, he called out to the defendant to ask him to bring over a certain tool. He heard the defendant tell another person at the junkyard, Ali Muhammed, that "'I'm not giving him s***t.'" When the defendant did not respond, the victim went to the tool shed and asked for the tool. The defendant responded that he would not give it to him and threw the tool down onto the ground. The victim picked the tool up and finished working under the van. The victim testified that when he went to the tool shed to return the tool, the defendant was "fixing to snatch it out of [the victim's] hand[,] so [he] threw it down and . . . cursed him." The victim said that he told the defendant that he was "acting like a f***ing b***h." The victim testified that he returned to the van for approximately ten minutes. When he finished, he began walking to the next vehicle he was going to work on, and the defendant was walking in front of him towards East Street. The victim said, "I guess he thought I was following him or something[,] and he said, 'What are you going to do[?]'" The victim did not respond, and the defendant "pulled the gun up." The victim said that he asked the defendant what he was going to do with the gun, and the defendant shot him on the left side of his torso. The victim testified that he was ten to fifteen steps away from the defendant when he fired the first shot. The victim turned around to walk back toward the junkyard, and the defendant shot him on the right side of his torso. The victim fell onto his back, and the defendant "ran full force and jumped on top of [him]." The victim testified that the defendant was sitting on top of him. The defendant tried to shoot him in the head, but the gun did not work. The victim said that the defendant "reached in his pocket and got some kind of little object and was fumbling with the gun." He testified that the defendant hit him

and then shot him again. The victim said that he had thrown his arm up to protect himself, and the bullet went through his arm. The victim said that he thought the sound of sirens made the defendant run away, and the victim was able to get up and walk to a car driven by Ali Muhammed. Mr. Muhammed drove him toward a hospital and flagged down a police car along the way. An ambulance took the victim to the Regional Medical Center. On February 22, 2008, police officers visited him at the hospital and showed him a photographic lineup. The victim identified the defendant as the person who shot him. He said that he had never seen the defendant with a gun before but that the defendant had told him that he had fired a shot in the junkyard. The victim said that four people witnessed the defendant shooting him: Melvin Osborne, Ali Muhammed, and two men who were working at a shop next to the junkyard.

On cross-examination, the victim testified that he told Melvin Osborne, whom he believed was the owner of the junkyard, that the defendant had been stealing from him. When he told the defendant what he had said to Mr. Osborne, the defendant "cursed [him] out."

Doss York testified that on February 21, 2008, he was doing construction work at a flower shop next to the junkyard where the victim and the defendant worked. He had been working at that site for approximately two weeks. He recalled having an interaction with the defendant at some point during that time but could not remember whether they had a conversation. On February 21, Mr. York said that he and Jason Arwood were sitting in a truck waiting for a tractor tire to be fixed. He heard yelling and a gunshot. He looked at the victim and saw the second and third gunshots. Mr. York identified the defendant as the shooter. He testified that the defendant was four to six feet away from the victim when he fired the second shot. Mr. York said that when the victim fell, the defendant sat on top of him and hit him three or four times. The gun went off again, and the defendant ran away. Mr. York said that he got out of the truck to check on the victim, and the victim got up and walked to a car. The driver of the car drove the victim away. Mr. York said that the defendant's gun was a small .380 handgun with a black handle and silver barrel.

Melvin Osborne testified that he managed the junkyard, which was owned by Charles Murphy. He said that he hired the victim and made an arrangement with the defendant to allow the defendant to live in a trailer on the lot in exchange for fixing a truck. On February 21, 2008, Mr. Osborne recalled that the defendant had packed all of his things and said that he was leaving. The defendant told him that he was waiting on a ride. Mr. Osborne said that the victim was working on a van, and the victim had a wrench but asked Mr. Osborne if he could use the defendant's socket. The defendant said that he did not want the victim to use his tools, and the victim threw the wrench down on the ground. The defendant said that the victim treated him like he was "'less than man.'" The victim responded that the defendant

needed to leave and that he should "'never have stopped up here.'" Mr. Osborne said that the defendant stood up and pulled out a pistol. Mr. Osborne testified, "[H]e got right up on [the victim] and told him, asked him, 'What are you going to do now?'" Mr. Osborne said that the victim was much larger than the defendant and that the victim was holding a wrench in his right hand. The victim asked the defendant what he was going to do with the gun, and the defendant shot the victim. The victim turned to run, and the defendant shot him a second time. Mr. Osborne said that the defendant jumped on top of the victim, and Mr. Osborne yelled at him, "'Please don't kill this man in front of us.'" The defendant hit the victim on the head with the pistol, and the pistol fired again. The defendant ran away, and the victim jumped up and ran to a car. Ali Muhammed drove the victim away, and Mr. Osborne called 911.

Ali Muhammed testified that he was at the junkyard on February 21, 2008, and witnessed the shooting. He said that he had known the victim for nine months to one year and had known the defendant for one day. Mr. Muhammed recalled the victim and the defendant arguing about the man, Helmut, who lived in the same trailer as the defendant. He said that the victim told the defendant that he could not "put that man out of the trailer." Mr. Muhammed said that the victim kept calling the defendant "b***hes" all day. He recalled helping the victim work on the van. He said that while the victim was under the van, the victim asked the defendant for a tool, but the defendant did not respond. Mr. Muhammed said that the victim told the defendant, "'The next time you need something b***h, don't ask me for it, b***h.'" Mr. Muhammed testified that the defendant stood up and said, "'Hey man. I ain't going to be too many more of these b***hes.'" Mr. Muhammed said that the victim was "pretty big" and "was standing there [with] the wrench in his hand." He testified that the victim said, "'B***h, don't ask me for nothing else.'" Mr. Muhammed said that the defendant pulled out a pistol. He agreed that he told the police that the defendant told the victim he was going to die. He testified that the victim asked the defendant what he was going to do with the gun. The defendant shot the victim, who turned to run. The defendant shot him again, and the victim fell. The defendant hit the victim in the head with the pistol, and the pistol fired again. Mr. Muhammed said that the defendant's gun jammed, and the defendant walked away, trying to get the gun unjammed. Mr. Muhammed put the victim in his car and drove him away. When he saw police cars, he flagged them down.

Memphis Police Detective Ronald Weddle testified that he was the case officer in charge of the investigation into the February 21, 2008, shooting of Orlando Warren. He testified that he interviewed the defendant on February 25, 2008. He advised the defendant of his *Miranda* rights, and the defendant signed the advice of rights form. The defendant indicated that he would not confess to shooting the victim. Detective Weddle testified that the defendant "did [sic] elude to the fact that he did shoot him." The defendant told Detective Weddle that he and the victim "had been [in] a power struggle and he knew it

-4-

would eventually come to this."  The defendant said that he would give a statement confessing to shooting the victim if the detective would cut him a deal.  When Detective Weddle responded that he "wasn't allowed to cut anyone deals for a confession," the defendant indicated that he would not talk to the detective anymore.

Following the close of proof and deliberations, the jury convicted the defendant of criminal attempt to commit first degree murder, a Class A felony.  By operation of law, the court dismissed count two of the indictment, employing a firearm during the commission of a dangerous felony, because "criminal attempt first degree murder [was] not an enumerated offense for which the jury could return a verdict on the second count of that indictment."  The trial court held a sentencing hearing and sentenced the defendant as a repeat violent offender to life without the possibility of parole in the Tennessee Department of Correction.

## ANALYSIS

### I.  Sufficiency of the Evidence

The defendant argues that the evidence was insufficient to support his conviction for attempted first degree murder.  Specifically, he contends that the state did not prove premeditation and that the evidence, at best, supports a verdict of attempted voluntary manslaughter.

Our review begins with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt.  *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992).  Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict.  *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).  To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); Tenn. R. App. P. 13(e).  In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state.  *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992).  The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence.  *Carruthers*, 35 S.W.3d at 558; *Tuggle*, 639 S.W.2d at 914.  Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court.  *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).  We do not attempt to re-weigh or re-evaluate the evidence.  *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002); *Bland*, 958 S.W.2d at 659.  Likewise, we do not replace the jury's inferences drawn

from the circumstantial evidence with our own inferences. *See State v. Elkins*, 102 S.W.3d 578, 582 (Tenn. 2003); *Reid*, 91 S.W.3d at 277.

First degree murder is defined as the "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). A premeditated killing is one "done after the exercise of reflection and judgment." *Id.* § 39-13-202(d). Premeditation is explained as follows:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* An intentional act requires that the person have the desire to engage in the conduct or cause the result. *Id.* § 39-11-106(a)(18). Whether premeditation is present is a question of fact for the jury, and it may be determined from the circumstances surrounding the killing. *Bland*, 958 S.W.2d at 660; *State v. Anderson*, 835 S.W.2d 600, 605 (Tenn. Crim. App. 1992). Circumstances that may be indicative of premeditation include declarations of the intent to kill, procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, infliction of multiple wounds, the making of preparations before the killing for the purpose of concealing the crime, destruction or secretion of evidence, and calmness immediately after the killing. *State v. Jackson*, 173 S.W.3d 401, 409 (Tenn. 2005); *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000). A defendant's failure to render aid to a victim can also indicate the existence of premeditation. *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

In cases where the defendant has been charged with the attempted commission of a crime, there must be evidence that the defendant acted "with the kind of culpability otherwise required for the offense" and acted "with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." T.C.A. § 39-12-101(a), (a)(2). Criminal attempt also occurs when the defendant "acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." *Id.* § 39-12-101(a)(3).

Viewed in the light most favorable to the state, the evidence was more than sufficient to support the jury's verdict in this case. The victim and several eyewitnesses testified that the defendant shot the victim three times and hit him on the head repeatedly with a pistol.

Witnesses disagreed about whether the victim was holding a wrench at the time of the shooting, but all witnesses agreed that the victim did not have a weapon. The use of a deadly weapon on an unarmed victim and the infliction of multiple wounds both support a finding of premeditation. Additionally, one witness testified that the defendant told the victim that he was going to die. The defendant argues that there was adequate provocation to reduce the charge to attempted voluntary manslaughter. Whether adequate provocation exists so as to support a conviction for voluntary manslaughter is a question for the jury. *See State v. Johnson*, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995). In finding the defendant guilty of attempted first degree murder, the jury obviously rejected the theory that the defendant was adequately provoked to act in an irrational manner by shooting the victim. As previously noted, the jury, as the trier of fact, determines the weight and value of the evidence and resolves all conflicts in the evidence. *See Bland*, 958 S.W.2d at 659. The jury, as was their prerogative, chose not to credit the defendant's theory that he shot the victim while in a state of passion because he was adequately provoked, and we will not second-guess the factual determinations of the jury. Accordingly, the defendant is not entitled to relief on this issue.

## II. Dismissal of Employing a Firearm Charge

The defendant argues that the trial court erred by not dismissing the second count of the indictment, employing a firearm during the commission of a dangerous felony, prior to trial. Specifically, the defendant contends that "submitting the second count to the jury [imposed] an additional burden of deliberation upon them which they could avoid by not considering lesser included offenses."

The decision whether to dismiss an indictment lies within the discretion of the trial court. *State v. Harris*, 33 S.W.3d 767, 769 (Tenn. 2000) (citing *State v. Benn*, 713 S.W.2d 308, 311 (Tenn. 1986)). "Appellate courts 'may not interfere with a ruling made within the discretionary powers of the trial court absent clear abuse.'" *Id.* at 769 (quoting *State v. Street*, 768 S.W.2d 703, 709 (Tenn. Crim. App. 1988)). Therefore, we will not disturb the trial court's decision absent an abuse of discretion.

At the time of the charged offense, criminal attempt to commit first degree murder was not an enumerated dangerous felony under the statute codifying the offense of employing a firearm during the commission of a dangerous felony. *See* Tenn. Code Ann. § 39-17-1324 (2008). However, two of the lesser-included offenses were enumerated dangerous felonies, namely, criminal attempt to commit second degree murder and criminal attempt to commit voluntary manslaughter. *Id.* During the hearing on the defendant's motion to dismiss, the trial judge explained that if the jury convicted the defendant as charged in count one, then they would be precluded from considering count two, but if the jury convicted the defendant of a lesser-included offense that was also a dangerous felony

under Tennessee Code Annotated section 39-17-1324, then the jury would consider count two. The defendant does not present any authority supporting his proposition that submitting both counts to the jury would encourage the jury to avoid convicting the defendant of a lesser-included offense merely so that they would not have to deliberate on the second count. The reasoning behind the trial court's decision to deny the defendant's pre-trial motion to dismiss the second count of the indictment was sound, and the defendant has not shown that the trial court abused its discretion. Therefore, he is without relief as to this issue.

## <u>CONCLUSION</u>

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE