# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### April 15, 2005 Session Heard at Pulaski[1]

## STATE OF TENNESSEE v. VINCENT JACKSON

**Appeal by permission from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. 96-12127     John P. Colton, Jr., Judge**

---

**No. W2003-01212-SC-R11-CD** - **Filed September 29, 2005**

---

We granted the State's application to appeal in this case pursuant to Tennessee Rule of Appellate Procedure 11 to determine, in light of the 1989 Revision of the Criminal Code, whether the long-honored rule that a homicide is presumptively second degree murder should be abandoned. Because our current statutory scheme requires that each element of the charged offense be proved beyond a reasonable doubt, we hold that the second degree murder presumption is now obsolete. Additionally, we have addressed the sufficiency of the evidence without engaging the presumption, and we conclude that the evidence presented is insufficient to convict the defendant of first degree murder (premeditated) beyond a reasonable doubt. The evidence is, however, sufficient to support the conclusion that the defendant knowingly killed the victim and, thereby, committed second degree murder. Accordingly, we affirm the judgment of conviction entered by the Court of Criminal Appeals and remand the case to the trial court for a new sentencing hearing.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals**
**Affirmed and Case Remanded to the Criminal Court for Shelby County**

ADOLPHO A. BIRCH, JR., J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, C.J., and E. RILEY ANDERSON, JANICE M. HOLDER, and WILLIAM M. BARKER, JJ., joined.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Kathy D. Aslinger, Assistant Attorney General; William L. Gibbons, District Attorney General; and Daniel R. Woody, Assistant District Attorney General, for the appellant, State of Tennessee.

Robert L. Parris, Memphis, Tennessee (at post-trial hearing and on appeal); Mike Roberts, Memphis, Tennessee (at post-trial hearing); and Betty Thomas, Assistant Public Defender (at trial), for the appellee, Vincent Jackson.

---

[1]This case was heard as part of the April 15, 2005, S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project in Pulaski, Giles County, Tennessee.

**Opinion**

**I. Facts and Procedural History**

In 1996, a Shelby County Grand Jury indicted the defendant, Vincent Jackson, on one count of first degree murder (premeditated) and one count of first degree murder (felony-robbery) in the shooting death of the victim, Ernest Harris. Trial of the cause commenced in March 1998, and the following salient evidence was adduced:

Responding to a dispatch regarding a suspicious vehicle parked on Old Horn Lake Road, police found the victim's body in the trunk of his car. Investigators testified that a blood-filled plastic garbage bag had been tied over his head; they discovered over $200 and a small amount of marijuana on the victim's body.

Wendy Gunther, an assistant medical examiner for Shelby County, testified as an expert forensic pathologist. She performed an autopsy on the victim and determined that he had died from two gunshot wounds to the back of his head. She stated that the bullets lodged underneath his jaw after they had passed through his brain.

Sergeant Edward Cash, Memphis Police Department, started his investigation of the killing by visiting 6 West Rollins, a residence occupied by Mary Fennell. There he observed blood on the carpet and the curtains. Cash learned that the defendant had been the last person in the residence prior to the killing.

Cash testified that on January 27, 1996, the defendant confessed to having killed the victim at 6 West Rollins. In the confession, which Cash read into the record, the defendant admitted that "on Thursday, January 25, 1996 around 8:30 to 9:00 a.m., while at 6 West Rollins, [he] did . . . shoot and kill Ernest Harris." The defendant also stated that he had shot the victim in the back of the head with a ".380 automatic." The defendant explained, "We had set up a deal. I didn't have all of my money, and I tried to grab the dope and run out with it; and he grabbed me; and I shot him." According to the statement, the defendant told the victim that he was approximately $3500 short on the money. The defendant stated, "Me and [the victim] kind of got into a verbal misunderstanding about the amount I was to pay so I grabbed the dope and the money and proceeded to run out of the house." He explained that as he tried to run out the door, the victim, while still seated, grabbed him and tried to get up out of the chair. The defendant stated, "That's when I reached into my pocket with my right hand and grabbed my gun and shot [the victim] in the back of the head twice while [the victim] was still seated."

At trial, the defendant reiterated much of his confession. He claimed, however, that some of the information in it was incorrect. He clarified his statement by recalling that he really first spoke to the victim about three weeks prior to the fatal encounter, and, during that conversation, the victim asked him if he sold drugs. The defendant responded that he did, and the victim told him to give him a call if he ever needed any. The victim gave the defendant his pager number.

The defendant testified that on the Wednesday prior to the killing, the victim paged him, but he did not receive the page until Thursday. The defendant recalled that on Thursday morning, the day of the killing, he went to 6 West Rollins and paged the victim. When the victim did not respond, the defendant paged him again. The defendant testified that while he was at the West Rollins residence, Ms. Fennell's children left to go to school. He stated that he became hungry, so he went to a nearby store to get food. On his way to the store, the defendant received a page from the victim. The defendant testified that he called the victim from the store between 8:00 and 8:30 a.m.

According to the defendant, the victim said he was "ready . . . to sell [the defendant] some dope." The defendant testified that he told the victim to meet him at 6 West Rollins with "a quarter or a half a quarter," and he gave the victim directions to the house. The defendant testified that the victim arrived about thirty or forty minutes later.

The defendant recalled that the victim arrived at 6 West Rollins with "a small bag with handles on it" and placed the bag on the table next to the defendant's money. The defendant stated that the victim "brought a quarter instead of a half of a quarter," so the victim wanted more money. The defendant explained that the victim asked for $7500, but the defendant had only $6000. The defendant testified that as he began to negotiate with the victim, the victim demanded the higher price for a lower amount of contraband. The defendant testified that he told the victim that he could not pay $7500, and the victim became agitated.

The defendant testified that he stood up, told the victim that he could not afford the drugs, and started to walk towards the door. He recalled that as he got near the door, he grabbed his money that was on the table, but when he did, he accidently grabbed the bag of drugs as well. The defendant testified that the victim "jumped out of his seat . . . and . . . started assaulting [him]." He claimed that the victim shoved him and then hit him in the face. He stated that the victim grabbed at the defendant's mouth, and the defendant pushed the victim back in the seat. According to the defendant, the victim stated, "you bitch, I'm going to kill you." He recalled that the victim then began to reach for what the defendant thought was a gun. The defendant testified that the victim continued to hold the defendant's arm, so the defendant ducked behind the chair that the victim was in and grabbed his own gun. He claimed that although he could not see the victim, he just "raised the gun up" and shot. He testified that it was not until he stood up that he realized that he had hit the victim.

The defendant testified that after the shooting, he ran to a back room and put the drugs and money down. He returned to the front room and noticed "a lot of blood coming out of [the victim's] head," so he grabbed a plastic garbage bag from the table and put it around the wound. He testified that he thought, "How can I get out of this?" At that point, he took the victim's car keys and backed the victim's car up to the side door of the residence. The defendant moved some furniture away from the door and went upstairs to get the victim's body. He laid the body at the bottom of the steps leading to the den. The defendant stated that he opened the trunk of the car, went back inside to get the body, and placed the body in the trunk. He opined that it took him between five and fifteen minutes to move the victim's body.

-3-

The defendant testified that after he loaded the body into the trunk, he went back into the house, wiped up the excess blood, and placed the soiled towels in a bag. He stated that he took the bag of towels with him, got into the car, and drove to Old Horn Lake Road. He parked the car, threw the keys across the street, and walked to a nearby gas station. There, he threw the bag of towels in a dumpster and walked back to 6 West Rollins where he got the items out of the back room and left.

The defendant recalled that he just drove around for awhile and that at some point, he went to pick up his brother, Michael Jackson, and later dropped him off at his brother's girlfriend's place. The defendant testified also that he received a page from Mary Fennell. He returned the call and said that he "didn't know anything." He stated that after the conversation, he drove downtown and threw the gun and the drugs in the Mississippi River.

On cross-examination, the defendant testified that dealing cocaine was "just something that [he does] in between jobs." He recalled that before the killing, he had been selling for about a month and a half. He acknowledged that after the shooting, he let the victim lay there for about five or ten minutes with "blood spurting out of his head" while he considered what he was going to do. The defendant stated that he never checked to see if the victim was dead; he just assumed that he was dead.

Following a trial, the jury convicted the defendant of first degree murder (premeditated) and acquitted him of first degree murder (committed during the perpetration of a robbery). The trial court imposed a sentence of life imprisonment.

On direct appeal, the Court of Criminal Appeals concluded that the evidence of premeditation was insufficient to overcome the presumption that the killing was second degree murder. On that basis, the intermediate court reduced the defendant's conviction to second degree murder and remanded the cause to the trial court for re-sentencing.

Pursuant to Tennessee Rule of Appellate Procedure 11, the State seeks review of the Court of Criminal Appeals ruling, contending that the presumption of second degree murder has outlived its usefulness and should be abandoned.[2] Additionally, the State urges that the evidence was sufficient to convict the defendant of first degree murder (premeditated). Moreover, the State's issues aside, the defendant contends that juror misconduct deprived him of a fair trial.

## II. Second Degree Murder Presumption

### A. Standard of Review

---

[2]The trial court correctly instructed the jury on the elements of each crime and did not address the second degree murder presumption. However, when the case was before the Court of Criminal Appeals, the intermediate court based its holding on the fact that the evidence was not sufficient to rebut the presumption that the offense was second degree murder.

The State challenges the legal presumption that a homicide is second degree murder. This is a question of law; therefore, our review is de novo without a presumption of correctness. State v. Yoreck, 133 S.W.3d 606, 609 (Tenn. 2004).

## B. Analysis

In this appeal, the State contends that the presumption in favor of second degree murder relied upon by the Court of Criminal Appeals in reversing the defendant's first degree murder conviction is "outmoded and should be abandoned." The State insists that under the 1989 revision of the statutes, proof of a homicide does not necessarily place the offense within any of the six defined categories of homicide.

The presumption that a homicide is second degree murder is based on common law and was codified in Tennessee Code Annotated section 39-2-211(a) (1988). Once a killing was established, the law presumed it was murder in the second degree. Witt v. State, 46 Tenn. 5, 8 (Tenn. 1868) (overruled on other grounds). In order to raise the killing to first degree murder, the State was required to prove premeditation. State v. Bullington, 532 S.W.2d 556, 560 (Tenn. 1976). In Tennessee, under the pre-1989 statute, which is similar to the current statute, only two categories of murder existed–murder in the first degree and murder in the second degree. See Tenn. Code Ann. § 39-2-202(a) (1988) (defining first degree murder); Tenn. Code Ann. § 39-2-211(a) (1988) (stating that all other kinds of murder shall be deemed murder in the second degree). The codified presumption of second degree murder has since been repealed. Acts 1989, ch. 591, section 1.

In 1989, the legislature revised the criminal statutes, abolishing all common law offenses and replacing them with statutory offenses. Tenn. Code Ann. § 39-11-102, Sentencing Comm'n Comments. In so doing, the new statutory offense of criminal homicide was established. See Tenn. Code Ann. § 39-13-201 (2003). Criminal homicide currently includes the following six categories: first degree murder, second degree murder, voluntary manslaughter, criminally negligent homicide, vehicular homicide, and reckless homicide. See Tenn. Code Ann. §§ 39-13-202, -210, -211, -212, -213, and -215 (2003). Based on the current statutory scheme, no presumption is engaged to place a killing within any of the categories of criminal homicide. Rather, in order to convict a defendant of any of the categories of criminal homicide, the State must prove each element of the offense beyond a reasonable doubt. Tenn. Code Ann. § 39-11-201 (2003). Under the current statutory scheme, the presumption is no longer applicable and is, therefore, obsolete.

We note that the perceived vitality of the second degree murder presumption after the revision of the criminal code appears to have been generated from this Court's opinion in State v. Brown, 836 S.W.2d 530 (Tenn. 1992). There, the Court stated, "The law in Tennessee has long recognized that once the homicide has been established, it is presumed to be murder in the second degree." Id. at 543. Although Brown was decided in 1992, the homicide occurred in 1986, prior to the revision of the criminal statutes that resulted in the creation of six categories of criminal homicide. Thus, at the time of the offense in Brown, the only categories of murder were first degree and second degree. Therefore, the second degree murder presumption was properly applied in

Brown.  However, those cases following Brown in which the alleged offenses occurred after the statutory revision in 1989 apparently misapplied Brown, in that those cases should have been analyzed under the amended statutes.[3]

In addition to the foregoing, we note that the presumption is superfluous.  An instruction on the elements of the charged offense is sufficient to inform the jury of the law.  When a trial court omits the language of presumption but "otherwise clearly informs the jury that the State carries the burden of proving each and every element of first degree premeditated murder beyond a reasonable doubt and also includes a correct and complete instruction on second degree murder, a criminal defendant is not entitled to relief." State v. Coulter, 67 S.W.3d 3, 68 (Tenn. Crim. App. 2001).  The jury is instructed that in order to convict it must find the existence of each and every element of the offense beyond a reasonable doubt.  An additional instruction regarding the second degree murder presumption then becomes inaccurate, misleading, and, at once, confusing.  In this context, we recognize also that application of the second degree murder presumption may invite error.  Thus, we conclude that removing the second degree murder presumption will help clarify the law and avoid confusion.  Accordingly, today we abandon the second degree murder presumption.

We emphasize, however, that this Court's abandonment of the second degree murder presumption is not a new constitutional rule which must be given retroactive application.  "A rule that merely restates or reemphasizes pre-existing state law is not one that is new." Momon v. State, 18 S.W.3d 152 (Tenn. 2000).  The burden on the State to prove each element of a crime beyond a reasonable doubt has long been recognized by statute, case law, and constitutional provision.[4] See Id.  This decision merely clarifies the law regarding the second degree murder presumption.

### III.  Sufficiency of the Evidence

#### A.  Standard of Review

The defendant challenges the sufficiency of the convicting evidence.  Our standard of review is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Goodwin, 143 S.W.3d 771, 775 (Tenn. 2004).  When reviewing the evidence, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000).  "Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier

---

[3]A few of the cases that have misapplied Brown include: State v. Banks, No. W2000-00963-CCA-R3-CD, 2004 WL 1686868 (Tenn. Crim. App. 2004); State v. Coulter, 67 S.W.3d 3 (Tenn. Crim. App. 2001); State v. Boyd, 909 S.W.2d 50 (Tenn. Crim. App. 1995); State v. Boyd, No. 01-C-01-9109-CR-00281, 1993 WL 488322 (Tenn. Crim. App. 1993); and State v. Hassell, No. 02-C-01-9202-CR-00038, 1992 WL 386311 (Tenn. Crim. App. 1992).

[4]Additionally, we note that the presumption was only applied in this case at the intermediate court level, after the State had proven all of the elements of the crime beyond a reasonable doubt.

of fact, and this Court does not re-weigh or re-evaluate the evidence." State v. Evans, 108 S.W.3d 231, 236 (Tenn. 2003).

## B. Analysis

The State contends that there is abundant evidence of premeditation. The defendant, on the other hand, insists that the evidence of premeditation is insufficient for conviction of first degree murder (premeditated).

First degree premeditated murder is statutorily defined as "a premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (2001). An act is premeditated if the act is "done after the exercise of reflection and judgment." Id. at (d).

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id.

The element of premeditation is a factual question to be decided by a jury from all the circumstances surrounding the killing. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Although a jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). This Court has identified several circumstances that may support a finding of premeditation. Those circumstances include:

> [D]eclarations by the defendant of an intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing.

State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000).

Additionally, "[e]stablishment of a motive for the killing is a factor from which the jury may infer premeditation." State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004). "A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt." State v. Holton, 126 S.W.3d 845, 858 (Tenn. 2004). "[O]n appeal, the defendant has the burden of illustrating why the evidence is not sufficient to support the jury's verdict." Id.

-7-

Viewing the evidence in a light most favorable to the State, the intermediate court stated:

> Although, there was no showing that the victim was armed, no evidence was presented at trial indicating that the defendant made any declarations of intent to kill the victim, made any preparations to conceal the offense prior to shooting the victim, or had a previously formed design or intent to kill the victim. There was no showing of hostility between them. Furthermore, while the defendant possessed a gun, the evidence does not indicate that the defendant procured the gun for the purpose of killing the victim. See [State v.West, 844 S.W.2d 114, 147 (Tenn. 1992)] (noting that in failing to establish premeditation, the state failed to present proof of its theory that the defendant returned to his residence and retrieved a gun for the specific purpose of killing the victim when the defendant testified he carried his gun with him all morning prior to the shooting). The record reflects the defendant shot an unarmed victim twice in the back of his head. The pathologist was unable to ascertain the locations of the parties at the time of the shooting but opined the muzzle was more than three feet away from the victim's [head]. Based upon the evidence, we are unable to conclude that the defendant killed the victim execution-style while the victim was kneeling, although it may have been a possibility.

We are persuaded that the conclusion reached by the intermediate court is the correct one without application of the presumption. Of the factors that this Court has acknowledged as tending to prove premeditation, only one–use of a deadly weapon on an unarmed victim–is present here. See Bland, 958 S.W.2d at 660. Even so, the defendant claimed that he believed that the victim was armed and prepared to shoot. Additionally, although the evidence establishes that the defendant shot the victim in the back of the head at a downward angle, no evidence in the record supports the conclusion that the victim was kneeling on the floor when the shots were fired. Furthermore, we also note, as did the Court of Criminal Appeals, that the jury acquitted the defendant of murder committed in the perpetration of robbery. Thus, we are unable to conclude that the defendant's motive for killing the victim was robbery.

Finally, we note that concealment of evidence of a crime, standing alone, is insufficient to prove premeditation. See State v. West, 844 S.W.2d 144, 148 (Tenn. 1992) ("The concealment of evidence . . . may be associated with the commission of *any* crime and the accompanying fear of punishment. One who kills another in a passionate rage may dispose of the weapon when reason returns just as readily as the cool, dispassionate killer."). This Court and the Court of Criminal Appeals have rejected finding such premeditation based solely upon a defendant concealing evidence after the crime. See West, 844 S.W.2d at 147 (defendant waiting an hour and a half before calling the police, during which time he hid the weapon and went about his business, was insufficient evidence of premeditation); State v. Long, 45 S.W.3d 611, 621 (Tenn. Crim. App. 2000) (defendant's actions hiding the victim's body, lying to the victim's mother, sister, and the sheriff about her whereabouts; and shooting pool with friends after the murder did not establish premeditation). In this case, the defendant attempted to conceal commission of the crime, but his sloppy incomplete efforts actually appear to undercut rather than support premeditation. Nothing

in the record indicates that the defendant gave any forethought to concealing the crime.[5] Based on the foregoing, we conclude that the evidence was insufficient for a rational trier-of-fact to find the defendant guilty of first degree premeditated murder beyond a reasonable doubt. See Jackson, 443 U.S. at 319.

## IV. Jury Sequestration

As a final issue, we address the defendant's contention that the rule of sequestration was violated and that several jurors misconducted themselves. The facts underlying this contention are: (1) that several jurors encountered the spouse of one of the deputies sworn to keep jurors separate and apart from all persons; (2) a juror spoke to an unidentified person at a restaurant; (3) deputies removed a non-juror from the line of jurors waiting to go through a buffet line; and (4) several jurors drank beer the night before the verdict was reached.

In criminal prosecutions in which a jury is sequestered, the trial court "shall prohibit the jurors from separating at times when they are not engaged upon actual trial or deliberation of the case." Tenn. Code Ann. § 40-18-116 (2003). "[T]he test of keeping a jury 'together' is not a literal one, requiring each juror to be at all times in the presence of all others." State v. Bondurant, 4 S.W.3d 662, 671 (Tenn. 1999). Rather, "[t]he real test is whether a juror passes from the attendance and control of the court officer." Id. Once a defendant shows that a jury has been separated, the burden shifts to the State to show that such separation did not result in prejudice to the defendant. Gonzalez v. State, 593 S.W.2d 288, 291 (Tenn. 1980). "If the State fails to meet the burden of showing that the separation did not result in prejudice, a new trial is required." Bondurant, 4 S.W.2d at 672.

In the present case, the defendant has adequately shown that the jurors were, in fact, separated. Thus, the burden shifts to the State to prove lack of prejudice. We conclude, as did the Court of Criminal Appeals, that the State met its burden. As the intermediate court noted, the State presented the testimony of all jurors on the panel as well as that of the deputy in charge of the jurors and that deputy's husband. All of the jurors and the deputy testified that they did not discuss the trial with any non-jurors. Additionally, the deputy's husband testified that he was unaware of the facts and circumstances underlying the trial. We are satisfied that the defendant was not prejudiced by the separation.

Nevertheless, we are constrained to note that the behavior of the jurors and those sworn to insulate them was reprehensible. Specifically, we refer to the consumption of alcoholic beverages while sequestered. The jurors and deputies who participated in this behavior testified that no person drank to the point of intoxication. However, we view such conduct as irresponsible and a breach of

---

[5]No evidence indicates that the defendant procured the gun to kill the victim. The defendant did not clean the apartment where the killing occurred, nor did he bring with him any of the items he used to attempt to conceal the crime. Also, the record does not demonstrate that the defendant carefully planned to hide the victim's body–although he placed the victim's body in the trunk of the victim's car, the defendant parked the car near where the killing occurred.

the jurors' sworn oath and solemn duty. Such conduct challenges the integrity of the jury system and deprives the public of the faith it must necessarily repose in our system of justice. Even though we have found that the jurors' conduct did not affect the deliberative process in this case, we condemn such conduct. Courts must continue to ensure the integrity of the jury system by holding jurors accountable to the highest standards of conduct.

## V. Conclusion

Accordingly, and for the reasons stated, we affirm the judgment of the Court of Criminal Appeals convicting the defendant of second degree murder. We remand to the trial court for a new sentencing hearing. It appearing that Vincent Jackson is indigent, costs are taxed to the State of Tennessee, for which execution may issue if necessary.

_____
ADOLPHO A. BIRCH, JR., JUSTICE