IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 14, 2011

**STATE OF TENNESSEE v. HENRY T. JOHNSON**

**Direct Appeal from the Circuit Court for Montgomery County**
**No. 40700905     John H. Gasaway, III, Judge**

---

**No. M2010-02452-CCA-R3-CD - Filed March 28, 2012**

---

A Montgomery County Circuit Court Jury convicted the appellant, Henry T. Johnson, of first degree premeditated murder and aggravated burglary. The trial court imposed concurrent sentences of life imprisonment in the Tennessee Department of Correction for the first degree murder conviction and three years for the aggravated burglary conviction. On appeal, the appellant challenges the sufficiency of the evidence sustaining his conviction for first degree murder, arguing that the State failed to prove premeditation. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JERRY L. SMITH and JAMES CURWOOD WITT, JR., JJ., joined.

Gregory D. Smith (on appeal) and Joel Wallace (at trial), Clarksville, Tennessee, for the appellant, Henry T. Johnson.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paduch Stempel, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and John Finklea and Arthur Bieber, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

The appellant was convicted of aggravated burglary and the premeditated first degree murder of the victim, Michael Zabik, on March 15, 2007. The proof at trial revealed that around 7:30 p.m., Anthony Thomas and Brian Spencer were at Brian's sister's apartment at

101B Chapel Street.[1]  The men heard a knock on the front door and a "commotion" outside. The sister asked who was at the door, and the victim, who lived nearby, identified himself. Brian and Thomas heard someone outside say, "I'm not going to keep telling you about my shit."  Brian recognized the voice as the appellant's.  Thereafter, the men heard a single gunshot.  Brian opened the door, and the victim "fell in" the apartment.  Brian saw someone run away but could not identify the person because it was dark.

Walter Spencer, Brian's brother who lived next door at 101A Chapel Street, heard the gunshot and went to his sister's apartment to make sure she was okay.  He saw the victim lying on the floor "with a hole in his stomach," and he was moaning and bleeding.  The men gathered around and asked the victim who shot him.  The victim replied, "Kojack," which was the appellant's nickname.  The sister called 911 to report the shooting, and emergency medical services (EMS) and law enforcement responded within minutes.

Agent Gregory Beebe, a narcotics agent with the Clarksville Police Department Major Crimes Unit, was the first officer to respond to the scene.  He saw the victim lying just inside the front door of the apartment.  The victim was moaning and rocking back and forth.  Agent Beebe saw a red, wet spot in the center of the victim's chest.  Agent Beebe asked the victim who shot him, and the victim said, "Kojack."  Detective David R. Galbraith arrived in time to hear the victim name the appellant as his assailant.

When Montgomery County Emergency Medical Technician Larry Nolan arrived at the apartment, he immediately noticed that the victim was in critical condition.  The victim had been shot in the chest, lost a great deal of blood, and complained of difficulty breathing. The EMS workers placed the victim in the ambulance and transported him to the hospital. When they neared the hospital, the victim's condition started "rapidly deteriorating."  He became agitated and repeatedly said that he did not want to die.  As the ambulance pulled up to the hospital, EMS workers performed chest compressions to try to increase the victim's heart rate.  Shortly after the victim was transferred to the emergency room, he went into cardiac arrest and died.

Medical Examiner Adele Lewis performed the autopsy of the victim.  She determined that the cause of death was a gunshot wound to the torso; the bullet entered just below the left nipple and traveled to the right, downward, and toward the back of the body.  The bullet fractured two ribs on the left side and injured the liver and gall bladder.  The bullet also injured the vena cava, a major blood vessel that drains blood from the abdomen.  Dr. Lewis described the injury to the vena cava as "more often th[a]n not a devastating injury."  She

_____

[1]  Some of the witnesses in this case share a surname.  Therefore, for clarity, we have chosen to utilize their first names.  We mean no disrespect to these individuals.

estimated that someone with that type of injury could possibly remain conscious for "an hour or two."

Police examined the scene at 101B Chapel Street and the victim's residence at 2112 North Ford Street, which were approximately twenty to twenty-five yards from each other. Detective Galbraith noticed that the victim's front door had been kicked open; three partial shoe prints were left on the door, and the door jamb was damaged. Testing revealed that the shoe prints were made by the appellant's shoes. Detective Galbraith said that the victim's apartment appeared to have been "ransacked."

Police arrested the appellant the day after the shooting. Lieutenant David Crockarell, one of the arresting officers, noticed that the appellant had a "very fresh haircut" and that the appellant's hair was "short . . . almost shaved."

After waiving his Miranda rights, the appellant initially denied any knowledge of the shooting. However, when he was advised that he had been identified as the shooter, the appellant said that he shot the victim because the victim was "disrespecting" him. The appellant said that he was homeless and that the victim allowed him to stay at the victim's apartment while he looked for a place to live. The appellant found a place but could not move in until April. When the appellant started moving his belongings out of the victim's residence, he noticed that some of his things were missing. He confronted the victim, who stated that he would get the items back for the appellant the following day. However, he never did. The appellant said that on the day of the shooting, he went to the victim's house to get the rest of his belongings, including a PlayStation which he planned to sell to a friend. The appellant said that the victim would not open the door, so the appellant kicked it open to retrieve his belongings. The victim started calling the appellant derogatory names and asserted that he would not give the appellant his PlayStation because the appellant had damaged the door. The appellant told police, "It was disrespect to me. He act like he had a gun like he was going to shoot me, but he was too slow, and then it happened." The appellant said the shooting happened after he and the victim walked to Chapel Street. The appellant disclosed that he hid the gun under a shed behind a house on E Street. Police found the rifle at the place the appellant described.

The appellant also told police that after the shooting, Angela Pittman picked him up "near Royal King." Pittman confirmed that the appellant asked her to pick him up at the end of E Street and that the appellant spent the night at her residence. Pittman said the appellant's demeanor "was [the] same as always," and he showed no indication that something bad had happened. The appellant shaved his head while at Pittman's house.

Police tested the appellant and his clothes for gunshot residue. No residue was found

on the appellant's clothes. Tennessee Bureau of Investigation (TBI) Agent Laura Hodge, who analyzed the gunshot residue kit taken from the appellant, stated that the "[e]lements indicative of gunshot residue were absent." She explained that due to the fragility of gunshot residue, "[t]hese results cannot eliminate the possibility the [appellant] could have fired, handled or was near a gun when it fired." She stated that the results can be affected by the length of time between the event and testing. The appellant's hands were tested two and one-half hours after the shooting, and his clothes were tested the day after the shooting.

Walter Spencer testified that on March 12 or 13, 2007, he was driving to the store with his three children and the victim. The victim was riding in the passenger seat and the three young children were in the backseat. As Walter turned onto E Street, the appellant waved for Walter to stop the vehicle. The appellant approached the passenger side of the vehicle and told the victim, "I want my shit or I'm going to kill you." The victim responded, "I'm not giving you anything." Walter drove away, not wanting his children exposed to further confrontation.

The appellant, who acknowledged that his nickname was "Kojack," testified that on the day of the shooting, he went to the victim's home to retrieve some items he had stored there until he could move into a new residence. The appellant removed some of his belongings, including a rifle, from a shed behind the victim's residence. Other items were located in the residence, so the appellant went to the back door. The appellant knocked several times, but there was no answer. The door was locked, and the appellant did not have a key.

The appellant went around to the front door, taking his belongings with him. He looked in the victim's bedroom window and saw that the victim was sleeping. The appellant knocked on the front door to rouse the victim, but the victim did not answer the door. The appellant kicked the door, attempting to wake the victim, and the door "came open." The victim came to the door, asking why the appellant had kicked the door. The appellant replied that it was an accident and that he would pay to have the door repaired. The appellant asked the victim to go with him to retrieve the appellant's DVD player and PlayStation that the victim had "loaned out."

The appellant and the victim started walking toward Chapel Street; the appellant was carrying his rifle in his hand, pointing it downward. The appellant asked what was bothering the victim, and the victim told the appellant that it was none of the appellant's business. The appellant replied, "I ain't going to have you talking to me like of some kind of child." The appellant told the victim that he was upset that the victim had loaned his property in order to get drugs without the appellant's permission. The appellant said that the victim then "ma[d]e a move" and that the appellant threw up his hand to avoid being hit in the face. The

-4-

victim hit the appellant's arm, causing the appellant to lose his grip on the rifle. The appellant's finger accidentally caught the trigger, and the rifle fired. The victim grabbed his left side, and the appellant ran away. The appellant said that he felt bad and that he did not intend to shoot the victim.

Sometime after the shooting, the appellant asked someone whether a warrant had been issued for his arrest, and he was told that he was wanted for homicide. The appellant said that he "prepared for jail; I cut my braids off, because I knew I didn't have no one to do my hair [in jail.]" Shortly thereafter, the appellant was arrested.

The appellant said that he initially denied any knowledge of the shooting because he was "a little confused." He denied telling police that he shot the victim because the victim disrespected him, explaining that he meant to say that the victim had been disrespectful by loaning the appellant's property without permission.

The appellant's former mother-in-law, Patricia Mize, testified that the appellant was a truthful person and that he took care of his children. Mize acknowledged that she was unaware that the appellant owned a gun.

Based on the foregoing, the jury found the appellant guilty of first degree premeditated murder and aggravated burglary. The trial court imposed an effective sentence of life imprisonment. On appeal, the appellant challenges the sufficiency of the evidence sustaining his first degree murder conviction.

## II. Analysis

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

In order to convict the appellant of first degree premeditated murder, the State was required to prove beyond a reasonable doubt that the appellant committed the "premeditated and intentional killing of [the victim]." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation "is an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself. [However,] [i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Id. at (d). Although there is no concrete test for determining the existence of premeditation, Tennessee courts have relied upon certain circumstances to infer premeditation. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Specifically, the following factors have been used to support a jury's inference of premeditation: (1) the appellant's prior relationship to the victim which might suggest a motive for the killing; (2) the appellant's declarations of intent to kill; (3) the appellant's planning activities before the killing; (4) the manner of the killing, including the appellant's using a deadly weapon upon an unarmed victim, killing the victim while the victim is retreating or attempting escape, or killing the victim in a particularly cruel manner; (5) the appellant's demeanor before and after the killing, including a calm demeanor immediately after the killing. See Pike, 978 S.W.2d at 914-915; State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Additionally, this court has suggested that facts concerning the prior relationship between the appellant and the victim from which motive could be inferred is indicative of premeditation. See State v. Gentry, 881 S.W.2d 1, 5 (Tenn. Crim. App. 1993).

The appellant contends that the State failed to sufficiently prove premeditation. He argues that in Tennessee, all homicides are presumed to be second degree murder. However, in State v. Jackson, 173 S.W.3d 401, 406 (Tenn. 2005), our supreme court clarified that the presumption was based upon common law. The court explained that following the revision of the criminal statutes in 1989, "no presumption is engaged to place a killing within any of the categories of criminal homicide" and that "the presumption is no longer applicable and is, therefore, obsolete." Id. at 407.

Moreover, we note that the State's proof reflected that two or three days prior to the shooting, the appellant threatened to kill the victim if the victim did not return the appellant's belongings. Immediately prior to the shooting, two witnesses heard a "commotion" during which the appellant said, "I'm not going to keep telling you about my shit." Thereafter, the appellant shot the unarmed victim. The appellant told police that he shot the victim because the victim was "disrespecting" him. Additionally, Pittman testified that the appellant did not act differently after the shooting. We conclude that the evidence is sufficient to sustain the appellant's conviction of first degree premeditated murder.

### III. Conclusion

In sum, we conclude that there was sufficient evidence for the jury to convict the appellant of first degree murder. Accordingly, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE