# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs January 7, 2014

## STATE OF TENNESSEE v. ELGIE SYKES

**Appeal from the Criminal Court for Shelby County**
**No. 07-07352     Lee V. Coffee, Judge**

---

**No. W2013-00334-CCA-R3-CD  - Filed February 10, 2014**

---

Following a retrial, the defendant, Elgie Sykes, was convicted of first degree premeditated murder and sentenced to life imprisonment.  On appeal, he argues that the evidence is insufficient to support his conviction.  Based upon our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR. and ROGER A. PAGE, JJ., joined.

Juni S. Ganguli (on appeal) and Paul Guibao (at trial), Memphis, Tennessee, for the appellant, Elgie Sykes.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Kate Edmands and Glen C. Baity, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

At the conclusion of his first trial, the defendant was convicted of first degree premeditated murder arising out of the April 7, 2007 shooting of the victim, Jason Hopson. The defendant was sentenced to life imprisonment.  On appeal, this court concluded that the evidence was sufficient to support the defendant's conviction but reversed the judgment of the trial court based on an improper jury instruction and remanded for a new trial.  State v. Elgie Sykes, No. W2009-02296-CCA-R3-CD, 2011 WL 2732660, at *8-11 (Tenn. Crim. App. July 14, 2011).  Thereafter, in December 2012, the defendant was retried and again

convicted of first degree premeditated murder and sentenced to life imprisonment. This appeal followed.

## State's Proof

Janette Jones, the victim's sister, testified that in July 2006 the victim and the defendant had an altercation regarding the victim's girlfriend, which resulted in the defendant's being shot. She subsequently saw the defendant as she was walking to an apartment on Fourth Street, and the defendant told her, "You need to tell your auntie and your mother to get a black dress because I'm going to kill your brother." She saw the defendant about four more times after that when he walked by her house. Jones said that the defendant "had a gun all the time . . . not hid or nothing like that. It was just on the side . . . . [The defendant] said he was just going to kill my brother. So I would say probably a month or a couple of weeks later, my brother was dead."

Leykishia Anderson testified that she saw the defendant on two occasions about two to three weeks before the shooting. The defendant first came to her apartment and asked the victim, whom Anderson was dating, to come outside, saying, "If we scrap it out now, . . . it'll be over with. Just come out." However, the victim refused to go outside. Anderson did not know if the defendant was armed but said "there was someone outside with him that was armed." The defendant subsequently came to her apartment again and told her that he and the victim had had "previous altercations that led to [the defendant] being shot and that [the defendant] almost died." The defendant warned Anderson to stay away from the victim or she "would be in the crossfire." The defendant told her that he was "going to get [the victim]."

Anderson said that on April 7, 2007, the victim called and wanted to come see her, and she told him not to come because she had company, but he did so anyway. When the victim arrived, Anderson stepped outside to talk to him and, after about five minutes, the victim suddenly pulled her inside the open door of her neighbor's apartment. Anderson turned around and saw the defendant "point-blank in [her] face with a gun." She did not see the victim display a gun. She broke free from the victim, who was using her as a shield, and heard four gunshots. She said the defendant was wearing a "big bubble coat with a hoodie type hat," but nothing covered his face. She identified photographs depicting her apartment, the victim's vehicle which was parked in front of her apartment, and the doorway of the apartment where the victim was shot, as well as the photographic array from which she identified the defendant as the shooter.

Aretha Williams, Leykishia Anderson's mother, testified that in April 2007 she and Anderson lived in an apartment complex on East McLemore and that the victim was

-2-

Anderson's boyfriend. She said that about a week before the shooting, the defendant came to her apartment while the victim was there. She refused to allow the defendant to come inside, and the defendant told her, "If you'd just tell [the victim] to come on out right now, we can fight and get it over with. . . . [The victim] killed me two years ago when he shot me, and I died on the . . . operating table twice." The defendant eventually left.

Williams said that on April 7, 2007, the victim came to her apartment asking for Anderson. Anderson went outside to talk to the victim because she did not want him to know she had company. Williams then heard a gunshot and her daughter yelling, "Mama, mama." She ran out the door and saw the defendant, whom she "immediately" recognized, pointing a gun at Anderson and the victim. The defendant told the victim to let Anderson go. Williams explained that the victim had Anderson "in his grasp. [Anderson] was in front. [Anderson] would snatch away from [the victim], and [the defendant] would shoot." Williams said she heard four gunshots and saw the victim fall to the ground. She did not see the victim with a weapon. She subsequently identified the defendant from a photographic array shown to her by the police and identified him in the courtroom as the person who shot the victim.

Tori Davis, a friend of the defendant, testified that in April 2007 she lived with her sister, Deanna Johns, in an apartment on East McLemore. She said that the defendant, who was wearing a blue shirt, blue work pants, and a black, hooded leather jacket, came to her apartment on April 7, 2007. They talked outside for a few minutes, and when the defendant left, Davis went back inside her apartment. She then heard gunshots, waited about a minute, and went outside to the parking lot. She saw the defendant walking toward the parking lot and told him to come inside her apartment. They went inside, and the defendant took off his blue pants and blue shirt, revealing that he had on gold-colored pants and a white T-shirt underneath. The defendant's blue pants and blue shirt were put in Davis' black Nike bag and left in her sister's bedroom. She identified the blue shirt, blue pants, and black leather jacket admitted as exhibits as the clothing the defendant was wearing that night.

Davis said that the police came to her apartment the next day, and her sister gave them permission to conduct a search. The police recovered a gun in the "junky room" of the apartment, which was the last room she saw the defendant walk out of the night of the shooting.

Jean Dandridge testified that, in April 2007, the defendant was her boyfriend and that she lived within walking distance of the apartment complex where the victim was shot. She said that the victim shot the defendant in July 2006 and that the defendant was upset as a result of the serious injuries he suffered and wanted "[the victim] to feel his pain, like he had hurt him." She saw the defendant with a silver gun with a wood handle "during the

summertime after he had healed and he kept running into [the victim]." She said that the defendant was afraid for his life because people had told him that the victim wanted to "finish the job."

Dandridge said that on April 7, 2007, she was working a 10:30 p.m. to 6:30 a.m. shift and that the defendant and her son were at her home when she left for work. She called home before midnight and spoke to her son who told her that the defendant was still there. She called home again sometime after 1:00 a.m., and her son told her that the defendant had left shortly after midnight and returned after 1:00 a.m. When she arrived home from work around 7:00 a.m., the defendant was sleeping. Later that morning, the defendant received a phone call from a friend advising him that the police were looking for him because he "had did a . . . horrific crime." The defendant told Dandridge that he had been in the area of the shooting and that as he was crossing a street, the victim "tried to run over him with the car." The defendant told her that he had "fired a couple of shots" at the victim but had not hurt him. Dandridge, her son, and the defendant later took a bag containing the defendant's black leather jacket to a garbage dumpster behind Bountiful Blessings Church.

Tracy Beavers, Jr., Dandridge's son, testified that in April 2007 he was in the twelfth grade and that his mother worked the third shift as a caregiver. He said that the defendant owned a silver gun with a sandy handle and that he saw the gun in the trunk of his mother's car a few days before April 7, 2007. He said that on April 7, 2007, the defendant was at home with him when his mother left for work. Sometime around midnight, the defendant received a phone call and then left wearing a black jacket and black hoodie. When the defendant returned around 1:30 a.m., he was wearing the same clothes and told Beavers that he was tired and was going to bed. Later that morning, Beavers saw his mother crying, "like . . . she was having a nervous breakdown, like she was hurt or something." The defendant told Beavers "to remember everything that ha[d] happened from that Friday to all up way [sic] until that Saturday morning repeatedly and to keep in mind as far as for everything that ha[d] happened." The defendant instructed Beavers to put his black jacket and hoodie in a trash bag, which Beavers later put in a dumpster near a post office. Beavers identified photographs of the defendant's black leather jacket and black hoodie that he placed in the trash bag.

Sergeant Michael Hill of the Memphis Police Department testified that he responded to a "critical wounded" call at the scene of the shooting. He identified a bullet fragment recovered from the scene.

Officer Newton Morgan of the Memphis Police Department testified that on April 7, 2007, he was called to the intersection of St. Paul and Hernando to photograph and collect evidence, including a black leather jacket and a black cotton jacket. The jackets were

-4-

recovered from a garbage can near Bountiful Blessings Church.

Sergeant Kevin Lundy of the Memphis Police Department testified that he searched Deanna Johns's apartment on April 8, 2007, after receiving her consent. He collected into evidence a pair of blue work pants in a Nike sports bag found in the back bedroom and a handgun containing four spent .38 caliber casings and one live .38 caliber round found in the "junk room."

Special Agent Steve Scott of the Tennessee Bureau of Investigation testified that he examined the revolver, fired cartridge cases, and live cartridge recovered in the case, as well as bullets recovered from the victim's body during autopsy. He determined that the bullet recovered from the crime scene and all three bullets recovered from the victim's body had been fired through the barrel of the revolver.

Dr. Miguel Laboy testified that he performed the autopsy on the victim's body, which revealed multiple gunshot wounds to the right side of the chest and the left and right sides of the back. Dr. Laboy said that he recovered three projectiles from the victim's body.

**Defense Proof**

Takelia Turner, the defendant's cousin, testified that the victim was her boyfriend in 2006 and that he had assaulted her on three occasions. She did not report any of the incidents to the police but sought help from the defendant. She and the defendant confronted the victim at the victim's house, and the defendant asked the victim to "come off the porch and fight him like a man." The victim went inside the house, came back outside, said, "I'm tired of everybody thinking I'm a weak person," and then shot the defendant two times.

Carolyn Childs, the defendant's sister, testified that the defendant was hospitalized for three or four weeks after the victim shot him. She said that following his discharge from the hospital, the defendant was nervous and "jittery." She never heard the defendant discuss seeking revenge against the victim, and the defendant told her that "he was just going to leave it alone." Childs learned from people in the neighborhood that threats had been made against the defendant. She said that the defendant was "scared that the [victim] was going to do something to him."

Henry Love, II, testified that he was presently incarcerated for an aggravated robbery conviction and that he had known both the defendant and the victim most of his life. He said that they all grew up in the inner city where there was a lot of crime, violence, and guns. He said that the victim always carried a gun. The victim told Love that he shot the defendant because the defendant "should have stayed up out [of the victim's] business." The victim

-5-

also told Love that when he saw the defendant again he was "not going to play with him. I'm going to make sure I kill him this time."

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant challenges the sufficiency of the convicting evidence, arguing that the evidence only supported a conviction for voluntary manslaughter as "there was extreme provocation. The shooting happened while [the defendant] was in a state of passion."

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A criminal offense may be established entirely by circumstantial evidence. State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010). It is for the jury to determine the weight to be given the circumstantial evidence and the extent to which the circumstances are consistent with the guilt of the defendant and inconsistent with his innocence. State v. James, 315 S.W.3d 440, 456 (Tenn. 2010). In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 380-81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

First degree murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (2010). An intentional act requires that the person have the desire to engage in conduct or cause the result. Id. § 39-11-106(a)(18). "Premeditation" is

an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d).

Whether premeditation is present is a question of fact for the jury, and it may be determined from the circumstances surrounding the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Anderson, 835 S.W.2d 600, 605 (Tenn. Crim. App. 1992). Circumstances that may be indicative of premeditation include declarations of the intent to kill, procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, infliction of multiple wounds, the making of preparations before the killing for the purpose of concealing the crime, destruction or secretion of evidence, and calmness immediately after the killing. State v. Jackson, 173 S.W.3d 401, 409 (Tenn. 2005); State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000). A defendant's failure to render aid to a victim can also indicate the existence of premeditation. State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

In the light most favorable to the State, the evidence showed that the victim and the defendant had an ongoing conflict for several months, with the victim first shooting and seriously injuring the defendant in July 2006 and culminating with the defendant fatally shooting the victim in April 2007. Leykishia Anderson testified that the defendant came to her apartment on two occasions a few weeks before the April 2007 shooting, first asking for the victim to come outside so they could "scrap it out now," and then to warn her to stay away from the victim or she "would be in the crossfire." The victim's sister, Janette Jones, testified that, a few weeks before the shooting, the defendant, who "had a gun all the time," told her to tell her mother to get a black dress because he was going to kill her brother. Both Anderson and her mother, Aretha Williams, identified the defendant as the person who shot and killed the victim on April 7, 2007. Neither witness saw the victim with a gun. After the shooting, the defendant changed his clothes at Tori Davis' apartment and later had his girlfriend's son dispose of his black leather jacket in a trash dumpster. Testing revealed that the bullets recovered from the victim's body were fired through the barrel of the revolver found in the "junk room" of Davis' apartment, the last room Davis saw the defendant walk out of after the shooting. This evidence was sufficient to support the jury's finding that the victim's death was the result of the defendant's premeditated act. We conclude, therefore, that the evidence is sufficient to sustain the defendant's conviction for first degree premeditated murder.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE