IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 4, 2022

## STATE OF TENNESSEE v. DEMARCUS WOOTEN

**Appeal from the Criminal Court for Shelby County**
No. 20-01517        W. Mark Ward, Judge
_____

### No. W2022-00315-CCA-R3-CD
_____

A Shelby County jury found the Defendant, Demarcus Wooten, guilty of the offenses of first degree murder, attempted first degree murder, and employing a firearm during the commission of a dangerous felony. The trial court imposed a total effective sentence of life plus twenty-nine years. On appeal, the Defendant argues that the evidence is insufficient to sustain his murder and attempted murder convictions, arguing principally that the proof did not establish the elements of intent and premeditation. We respectfully disagree, and we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TOM GREENHOLTZ, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and J. ROSS DYER, JJ., joined.

Joshua J. Roberts (on appeal) and John Dolan (at trial), Memphis, Tennessee, for the appellant, Demarcus Wooten.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Paul Hagerman and Doug Carriker, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

# FACTUAL BACKGROUND

On June 30, 2020, the Shelby County Grand Jury returned a multi-count indictment charging the Defendant in count one with the attempted first degree premeditated murder of Lewis Holman; in count two with employing a firearm during a dangerous felony, specifically the attempted first degree murder of Mr. Holman; and in count three with the first degree premeditated murder of Willie Gandy.

At trial, Marquasha Williams testified that in June 2019, she was living in Memphis. She was twenty-one years old, was not working, and was not in school. On the night of June 11, 2019, Ms. Williams was with Antionesha Lurry. Although the women had not known each other long, they were friends. They were at Ms. Williams's house when Ms. Williams received a call from a friend identified only as "Cameron," who asked them to drive him to a friend's apartment. Because Ms. Williams did not "feel like driving," Ms. Lurry drove Ms. Williams's car.

After they arrived at the apartment where Cameron was waiting, Ms. Williams was introduced to five other men. One of these men was the Defendant, Demarcus Wooten, though Ms. Williams knew him only by the nickname, "Hot Head." The eight people got into two cars, including Ms. Williams's car. In Ms. Williams's car, Ms. Lurry sat in the driver's seat, Ms. Williams sat in the front passenger's seat, the Defendant sat behind Ms. Lurry, and Cameron sat behind Ms. Williams. While in the cars, everyone smoked marijuana. They stayed at the apartment complex for approximately twenty-five minutes, and Cameron asked if he could be driven to his cousin's house. The four then went to McDonald's for food and thereafter followed Cameron's directions to his cousin's house.

After they dropped off Cameron at his cousin's house, the Defendant remained seated in the car behind Ms. Lurry. As they drove on Mt. Moriah Road approaching the intersection with Willow Road, Ms. Williams heard a loud gunshot from the driver's side of the car. Until that time, Ms. Williams did not know that the Defendant had a gun.

The gunfire caused Ms. Williams to be afraid. Although she did not ask Ms. Lurry to stop the car, nor did she ask the Defendant to stop shooting or to get out of the car, Ms. Williams asked the Defendant why he shot the gun. Ms. Williams said that the Defendant responded to her that "he do[es] what he wants."

Ms. Lurry continued to drive on Mt. Moriah Road and stopped at a red light near a church. A man, who was later identified as Mr. Gandy, walked in front of Ms. Williams's

car at a crosswalk. Ms. Williams looked down at her phone, then she heard another gunshot. She looked up and saw Mr. Gandy fall to the ground. Ms. Lurry asked the Defendant why he shot the man, and the Defendant told her to "go, go, go." The Defendant tried to add an address to the global positioning system (GPS), but it froze. Ms. Lurry then made a U-turn and drove by Mr. Gandy's body lying in the road. Then, they drove onto the interstate and took the Defendant to a woman's house on Riverdale Road.

Afterward, Ms. Williams and Ms. Lurry drove to Binghampton to take Ms. Lurry home. During the drive, Ms. Williams and Ms. Lurry discussed what had happened, but neither of them reported it to the police. Ms. Williams explained that she was terrified because she had "just seen a man get shot." After dropping off Ms. Lurry, Ms. Williams drove home.

Ms. Williams said that she did not know the Defendant before the night of the shootings and that they were not friends on Facebook. Nevertheless, sometime after the shootings, the Defendant contacted Ms. Williams via Facebook Messenger. Ms. Williams said she knew the message came from the Defendant because it "was like a threat of saying that if I was to say anything they would have killed me." Ms. Williams explained that the threat was part of the reason she did not immediately report the crimes to the police.

On November 9, 2019, approximately five months after the shootings, Ms. Williams gave a statement to investigators at the Memphis Police Department. She also identified the Defendant from a photographic lineup, though she accidentally wrote the wrong date on the identification form because she was nervous. Ms. Williams identified a video recording that showed her car making a wide turn as it drove onto an entrance ramp for the interstate right after the shooting. Ms. Williams said that no one had done anything to provoke the Defendant before either of the shootings.

On cross-examination, Ms. Williams acknowledged that she did not wear a watch and that she kept track of time on her cell phone. However, she did not know when she, Ms. Lurry, and Cameron went to the apartment complex. She agreed that it could stay light outside until 9:00 p.m. in June and that it was dark outside when they went to the apartment. She agreed that the shootings took place sometime after 2:00 a.m., approximately five hours after they went to the apartment complex. Ms. Williams agreed that she, Ms. Lurry, Cameron, and the Defendant smoked marijuana for twenty minutes at the apartment complex. But, she could not recall what they did for the other four hours and forty minutes between the time that they left the apartment complex and when the shootings began.

Ms. Williams said that at least one of her car's windows was down when the Defendant fired the first shot. She agreed that the gunshot "scared the daylights out of" her. She did not get out of the car because it was in motion, and she was afraid her life was in danger. Ms. Williams said that she previously had been to the area where the first shooting occurred but that she did not "hang out" there.

Ms. Williams recalled hearing another gunshot after seeing Mr. Gandy walk across the crosswalk in front of her car. After the Defendant shot Mr. Gandy, Ms. Lurry asked, "[W]hat the f***. Why you just shoot that person?" Ms. Williams did not say anything to the Defendant, and she did not contact anyone about the shootings.

Lewis Holman was the victim in the Defendant's first shooting. He testified that shortly after midnight on June 12, 2019, he was at home in bed near the University of Memphis when a friend called and asked for a ride home from work. A little after 2:00 a.m., Mr. Holman drove his friend to a residence on Helene Street off of Mt. Moriah Road, and he thereafter headed home. He was driving on Mt. Moriah Road, but someone shot his car as he started to turn right onto Willow Street. Although the windows of his car were up, he heard the gunshot, as well as glass "falling in on [him]" from the rear driver's side door.

After the shot, Mr. Holman crouched down, put his car in park, and waited a few minutes before getting out to check himself and his car. Although he did not call the police immediately because he wanted to be safe at home if someone was shooting, he did speak with officers later that morning.

Joshua Echols, who was one of the five other people originally introduced to Ms. Williams, also testified at trial. Mr. Echols said on "that night in 2019," he was "chilling" with Ms. Lurry, Ms. Williams, the Defendant, and Cameron. Mr. Echols testified that he knew Ms. Lurry from school and that he also knew the Defendant, but not well. He confirmed that he was inside one of the cars at the apartment complex and was "chilling, smoking."

Mr. Echols testified that he called someone named "Steve-O" to take him home, and he left the apartment complex. After he arrived home, Mr. Echols received a call from Ms. Lurry saying that something "had just happened." At 3:16 a.m., Mr. Echols sent a Facebook message to the Defendant, saying, "You tweaking gang," which Mr. Echols explained meant he was asking if the Defendant was "bullsh***ing." The Defendant responded, "Y u you say that?" Mr. Echols replied, "[D]id him dirty," which Mr. Echols

- 4 -

explained meant that he "[k]illed somebody." The Defendant said, "He dead." After Mr. Echols again accused the Defendant of "bullsh***ing," the Defendant replied, "Hope he okay," followed by several laughing emojis. Mr. Echols did not talk to the Defendant after exchanging the Facebook messages, and he testified on cross-examination that, because he did not see who sent the Facebook messages, he could not be certain the messages came from the Defendant.

Memphis Police Officer Fredrick Reading testified that between 2:30 and 2:40 a.m. on June 12, 2019, he responded to a "man down call" in the area of Mt. Moriah Road and Quince Road. Upon his arrival, Officer Reading saw Mr. Gandy lying on the ground. A man and a woman tried to help him, but Mr. Gandy was unresponsive. The couple told Officer Reading that they were driving when they saw Mr. Gandy, and they stopped to help and called for assistance. Officer Reading summoned the paramedics to the scene. When the paramedics lifted Mr. Gandy's shirt, they found gunshot wounds to his chest and back. The paramedics put Mr. Gandy into an ambulance and took him to the hospital.

Sergeant Michael Coburn with the homicide bureau of the Memphis Police Department testified that he investigated Mr. Gandy's death. Around 2:00 or 2:15 a.m. on June 12, 2019, Sergeant Coburn went to the scene of Quince Road and Mt. Moriah Road. Sergeant Coburn saw a couple of squad cars "securing the scene." Mr. Gandy had already been transported from the scene. The police searched for evidence, but they only found "a little blood on the ground." The police then searched the larger area and discovered a couple of real-time crime center (RTCC) cameras. Sergeant Coburn explained that the RTCC cameras were installed and monitored by law enforcement.

Sergeant Coburn said that later that morning on June 12, he learned that someone's car had also been shot near Mt. Moriah Road and Willow Road, which was south of the intersection where Mr. Gandy was killed. The sergeant suspected that the two shootings were connected, and he viewed the RTCC camera footage from both locations.

The State played for the jury a portion of the camera footage from the RTCC camera near the intersection where Mr. Gandy was killed. The video recording showed the suspect vehicle stopped at a red light. It also showed a person walking across the road and the person falling to the ground. Mr. Gandy's body was discovered in the area where the person in the camera footage fell.

Separately, Memphis Police Department Detective Christopher Malsom encountered the Defendant on June 21, 2019. During this encounter, the Detective

recovered from the Defendant a nine-millimeter "Glock 19, Gen4" handgun. The recovered weapon had an extended magazine, which held 40 rounds, and it was fully loaded with a round in the chamber.

The recovery of this nine-millimeter handgun was of interest to Sergeant Coburn, as he had recovered a spent nine-millimeter cartridge casing during his investigation of the location where Mr. Holman's car was shot. Sergeant Coburn suspected that the cartridge casing was related to one of the two shootings, and he sent the pistol and the cartridge casing for forensic testing.

After law enforcement recovered the nine-millimeter handgun from the Defendant, Sergeant Coburn became interested in the Defendant's connection with the crimes. The sergeant researched the Defendant's Facebook records and, as a result, went to speak with Mr. Echols. After this conversation, the sergeant spoke with Ms. Williams and Ms. Lurry. He also spoke with Mr. Holman and realized that the shooting of his car might have been connected to the killing of Mr. Gandy because the two shootings were "seconds, minutes" apart, "[t]he time it would take to travel that one big block."

Agent Cervinia Braswell with the Tennessee Bureau of Investigation (TBI) testified as an expert in the field of forensic firearms analysis and ammunition analysis. She compared the Defendant's Glock handgun with the recovered cartridge casing and determined that the casing was fired from the Defendant's handgun. On cross-examination, Agent Braswell acknowledged that she could not determine when the cartridge was fired or who fired the gun.

Dr. Katrina Vanpelt, who performed the autopsy of Mr. Gandy, testified as an expert in forensic pathology. During the autopsy, Dr. Vanpelt found a "perforating gunshot wound to the back." The bullet passed through a vertebra and the right lung before exiting on the right side of the chest. The bullet caused substantial damage and resulted in Mr. Gandy's death. No bullet was recovered, and drugs and alcohol were absent from Mr. Gandy's system.

Before the State rested its case, the parties entered into the following stipulation:

> On June the 21st of 2019 at 1632 hours, Demarcus Wooten, the defendant in this case, made a phone call from the Shelby County Jail intake that was monitored and recorded by jail staff. A copy of this call had been retained in evidence by Shelby County Deputies.

In that phone call, Demarcus Wooten makes a statement about being charged with a homicide that occurred on Mt. Moriah. He denies committing the homicide but states that, if the police have his gun, he could be charged with murder.

After the State rested, the Court denied the Defendant's motion for judgment of acquittal, and the Defendant chose to present evidence of his own. The first defense witness, Brianna Flowers, testified that the Defendant was the father of her child. On Tuesday, June 11, 2019, the Defendant came to her house at 11:30 p.m. and did not leave until 8:00 a.m. on June 14, 2019. The Defendant's cousin, Keosha Wooten, drove him to and from Ms. Flowers's house. Ms. Flowers did not keep any records, such as a calendar, text message, or note in her phone, to help her remember the date.

On cross-examination, Ms. Flowers said that she and the Defendant had talked and exchanged letters while he was incarcerated. Ms. Flowers said that she knew "[a] lot" about the Defendant's life in 2019 and maintained that he "wasn't hanging with nobody." Ms. Flowers did not know Steve-O, Cameron, or Ms. Lurry. She knew the Defendant had a Facebook account, but she could not look at the Defendant's Facebook page because she did not have a Facebook account. Nevertheless, she said that there were no photographs on Facebook showing the Defendant "hanging out with guys . . . with guns." Ms. Flowers said that she knew the Defendant was with her on June 11 because they were "cooking, watching Lifetime, chilling as usual" and because they were "with each other most of the time."

Keosha Wooten testified that she drove the Defendant to Ms. Flowers's house at 11:30 p.m. on June 11, 2019. Ms. Wooten thought that the Defendant remained there until she picked him up on the morning of June 14, 2019. Ms. Wooten agreed that she was "relying strictly on [her] memory about where [she] was at that day at that time."

On cross-examination, Ms. Wooten confirmed that she had spoken with the Defendant since he had been in jail. She did not know what the Defendant did after she left him at Ms. Flowers's house. When asked how she remembered the time in question, Ms. Wooten responded, "Because I remember it. It's something to remember when your family member gets locked up." She acknowledged, however, that she could not remember the specific day the Defendant was arrested, but she knew that the Defendant was not arrested at the time she left him at Ms. Flowers's house.

After the close of proof, the jury found the Defendant guilty of the charged offense in each count of the indictment. The trial court sentenced the Defendant to life imprisonment for the first degree murder conviction, and to twenty-three years for the attempted first degree murder conviction. As for the Defendant's conviction for employing a firearm during the commission of a dangerous felony, the trial court imposed a sentence of six years. The court ordered that the sentences be served consecutively, for an effective sentence of life plus twenty-nine years.

In this appeal, the Defendant challenges only the sufficiency of the evidence supporting his convictions for first degree murder and attempted first degree murder. Upon consideration of the arguments raised and the record as a whole, we affirm the convictions for each offense.

## STANDARD OF REVIEW

Our supreme court has recognized that "the first question for a reviewing court on any issue is 'what is the appropriate standard of review?'" *State v. Enix*, __ S.W.3d __, No. E2020-00231-SC-R11-CD, 2022 WL 4137238, at *4 (Tenn. Sept. 13, 2022). In reviewing a challenge to the sufficiency of the evidence, "a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt." *State v. Reynolds*, 635 S.W.3d 893, 914 (Tenn. 2021) (internal quotation marks and citations omitted). As such, "the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict." *State v. Jones*, 589 S.W.3d 747, 760 (Tenn. 2019) (citing *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982)).

"The standard for appellate review of a claim challenging the sufficiency of the State's evidence is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Miller*, 638 S.W.3d 136, 157 (Tenn. 2021) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). When "'making this determination, we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)). The trier of fact, not this Court, resolves "all questions as to the credibility of trial witnesses, the weight and value of the evidence, and issues of fact raised by the evidence," and this Court "may not re-weigh or re-evaluate the evidence." *State v. Lewter*, 313 S.W.3d 745, 747 (Tenn. 2010). "The standard of review is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (internal quotations and citations omitted).

# ANALYSIS

On appeal, the Defendant challenges the sufficiency of the evidence sustaining his convictions for the first degree murder of Mr. Gandy and the attempted first degree murder of Mr. Holman. More specifically, the Defendant asserts that the proof is insufficient to establish the elements of intent and premeditation. For its part, the State asserts that, viewing the evidence in the light most favorable to the State, a reasonable juror could have concluded that the State proved all essential elements of the charged offenses beyond a reasonable doubt. We agree with the State.

First degree murder is defined as the unlawful and "premeditated and intentional killing of another[.]" Tenn. Code Ann. §§ 39-13-201; 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id.* § 39-11-302(a). As charged in this case, the offense of attempted first degree murder is committed when a person acts with the intent to commit premeditated first degree murder and "[a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." *Id.* § 39-12-101(a)(2).

Our General Assembly has defined "premeditation" as being

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d) (2018) (subsequently amended). Like any other element of an offense, "the State must prove premeditation beyond a reasonable doubt." *Miller*, 638 S.W.3d at 159.

The question of "[w]hether premeditation is present in a given case is a question of fact to be determined by the jury from all of the circumstances surrounding the killing." *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). As our supreme court has observed,

Several factors are considered to infer premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. Additional considerations include a lack of provocation on the victim's part and a defendant's failure to render aid to a victim.

*State v. Clayton*, 535 S.W.3d 829, 845 (Tenn. 2017) (internal citations omitted). "[I]n determining the existence of premeditation, the trier of fact 'may not engage in speculation.'" *Reynolds*, 635 S.W.3d at 918 (quoting *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005)). That said, "Tennessee cases have long recognized that premeditation may be proved by circumstantial evidence" because "premeditation involves the defendant's state of mind, concerning which there is often no direct evidence." *Davidson*, 121 S.W.3d at 614-15.

## A.    FIRST DEGREE MURDER

The Defendant first argues that the proof is insufficient to support his conviction for the first degree murder of Mr. Gandy. The Defendant does not challenge his identity as the perpetrator, but he instead contends that the State failed to establish the element of premeditation. He acknowledges that Mr. Gandy was unarmed, that he was "shot in the back in the chest region from a close distance," that the Defendant failed to render aid to the victim, that the messages the Defendant exchanged with Mr. Echols immediately after the killing showed little or no remorse for the killing, and that the Defendant threatened a witness. However, the Defendant argues that "without more," each of these factors was insufficient for a jury to find that he killed Mr. Gandy with intent and premeditation. We respectfully disagree and conclude that the evidence is sufficient to support his conviction of this offense.

Viewing the evidence in a light most favorable to the State, the proof shows that Ms. Lurry drove a car belonging to her friend, Ms. Williams, on June 12, 2019. Ms. Williams herself rode in the front passenger seat, and the Defendant was in the back seat on the driver's side. When Ms. Lurry stopped at a red light, Mr. Gandy began walking across the street in the crosswalk. From his seat in the car, the Defendant shot Mr. Gandy in the back, and Mr. Gandy fell to the ground with a fatal wound. Mr. Gandy was unarmed, and he did not provoke the shooting. His back was also to the Defendant at the time he was shot. The circumstances of the killing support the jury's finding of premeditation and intent to kill. *See Clayton*, 535 S.W.3d at 845 (concluding that evidence was sufficient to

establish first degree murder when the defendant fired a deadly weapon on four unarmed victims, there was no provocation, the Defendant failed to render aid, and the Defendant fired a second, fatal bullet after injuring one of the victims); *State v. Frazier*, No. E2018-00202-CCA-R3-CD, 2019 WL 2750138, at \*18 (Tenn. Crim. App. July 1, 2019) (holding that the evidence was sufficient to show premeditation, in part, when "[t]he Defendant used a deadly weapon against an unarmed victim, who was running away from the Defendant at the time of the shooting").

Moreover, the Defendant's actions following the killing also support the jury's finding that the Defendant acted with premeditation and intent to kill. First, the Defendant did not stop to render aid to his victim or ask others to do so. Instead, he instructed Ms. Lurry to "go, go, go" so that he could flee from the scene of his crimes. These circumstances support the jury's finding of premeditation. *See State v. Rivas*, No. M2019-02241-CCA-R3-CD, 2021 WL 1625530, at \*23 (Tenn. Crim. App. Apr. 27, 2021), *perm. app. denied* (Tenn. Aug. 4, 2021) (holding that the evidence was sufficient to show premeditation, in part, when "[a]fter the shooting, Defendant Rivas and Defendant Fryer fled the scene and did not render aid to the victim.").

Second, shortly after the shootings, the Defendant exchanged Facebook messages with Mr. Echols, a person who was with him earlier in the evening. After Mr. Echols accused the Defendant of killing someone, the Defendant responded, "He dead," and "Hope he okay." These messages from the Defendant show that he was calm and, through the repeated use of the laughing emojis, appeared to find humor somehow in Mr. Gandy's death. These circumstances support the jury's finding of premeditation. *See State v. Allen*, No. E2020-00632-CCA-R3-CD, 2021 WL 1561579, at \*10 (Tenn. Crim. App. Apr. 21, 2021), *perm. app. denied* (Tenn. Aug. 6, 2021) (holding that the evidence was sufficient to show premeditation, in part, when "hours after the shooting, the Defendant and Alexis Godwin exchanged Facebook messages and the Defendant stated, 'Lex, I got [the victim].'" (alteration in original)); *State v. Lowe*, No. E2017-00435-CCA-R3-CD, 2018 WL 3323757, at \*12 (Tenn. Crim. App. July 6, 2018) (holding that the evidence was sufficient to show premeditation, in part, when "Ms. Blair described that, once the men were inside her car, it seemed like they did not care about what they done, 'like it was a joke,' or they were doing 'it for fun.'").

Finally, the Defendant sent Ms. Williams messages through Facebook messenger threatening to kill her if she spoke with anyone about the shootings. The Defendant's attempts to silence potential witnesses to his actions support the jury's finding of premeditation. *See State v. Parker*, No. E2018-01306-CCA-R3-CD, 2019 WL 5260863, at \*9 (Tenn. Crim. App. Oct. 17, 2019) (holding that the evidence was sufficient to show

- 11 -

premeditation, in part, when "each witness testified that the Defendant threatened to shoot one of them if they said anything.").

Based on this evidence, we conclude that a reasonable jury could have determined beyond a reasonable doubt that the defendant acted intentionally and with premeditation when he shot Mr. Gandy. In response, the Defendant argues that he had no relationship with, or motive to kill, Mr. Gandy and that, as such, the jury's finding of premeditation and intent cannot be sustained. We respectfully disagree.

As this Court has recognized previously, "[a] senseless, random killing is in no way inapposite to the concept of premeditation; otherwise, only planned assassinations would meet the elements of first degree premeditated murder." *State v. Ison*, No. E2018-02122-CCA-R3-CD, 2020 WL 3263384, at *7 (Tenn. Crim. App. June 17, 2020), *no perm. app.* Moreover, a defendant's motive is not an element that needs to be proven to sustain a conviction for first degree premeditated murder. *State v. Bell*, 512 S.W.3d 167, 191 (Tenn. 2015); *State v. Brown*, No. M2017-00904-CCA-R3-CD, 2019 WL 1514551, at *36 (Tenn. Crim. App. Apr. 8, 2019) (stating that "proof of motive is not necessary to sustain a conviction for first degree premeditated murder. Rather, motive is only one of many factors that may support a finding of premeditation." (citation omitted)). Moreover, this Court does not re-weigh or re-evaluate the evidence when reviewing the sufficiency of the evidence supporting a conviction. *Lewter*, 313 S.W.3d at 747. Given the clear evidence of premeditation and intent to kill, we conclude that the evidence is sufficient to support the Defendant's conviction for first degree murder.

## B.   ATTEMPTED FIRST DEGREE MURDER

The Defendant next argues that the proof is insufficient to support his conviction for the attempted first degree murder of Mr. Holman. Although the Defendant admits that he caused property damage to Mr. Holman's car—and, in so doing, concedes his identity as the shooter—he nevertheless asserts that the evidence does not show an intention to kill Mr. Holman apart from evidence that Mr. Holman was unarmed. We again respectfully disagree.

Viewing the evidence in a light most favorable to the State, the proof adduced at trial shows that the Defendant armed himself with a loaded pistol before entering Ms. Williams's car and that he kept this weapon concealed from others until he fired at Mr. Holman. Because Mr. Holman was driving a moving car, the jury could have reasonably inferred that the Defendant knew that a person was in the car at the time he fired the shot.

Moreover, the jury could also have reasonably inferred that the Defendant intentionally aimed at the driver of the car, as the bullet came "close by" through the rear window on the driver's side of the car. When Ms. Williams asked the Defendant why he fired a shot, the Defendant responded that "he do[es] what he wants," indicating that he "wanted"—or had the conscious objective or desire—to fire a deadly weapon directly at the driver of the other car. The intentional firing of an aimed shot at a car, knowing that an unarmed person is inside, is a factor that supports a finding that the defendant intended to kill. *Cf. State v. Avant*, No. W2018-01154-CCA-R3-CD, 2019 WL 3072131, at *12 (Tenn. Crim. App. July 12, 2019) ("In our view, the proof supported a finding by the jury that Defendants had the requisite intent to attempt to commit first degree murder. They opened fire on a home with people inside and were seen by Mr. Ware firing shots from the car.").

In addition, similar to the later murder of Mr. Gandy, the Defendant used a deadly weapon upon an unarmed victim who did nothing to provoke the Defendant's attack. The Defendant expressed no concern about Mr. Holman's welfare, and the Defendant took no action to render aid or to ask others to do so. And, the Defendant later threatened to kill Ms. Williams to ensure that she remained silent about his conduct. Taken together, all of these factors establish that the Defendant had an intention to kill Mr. Holman.

In response, the Defendant contends that, although Mr. Holman was unarmed, this fact alone is insufficient to establish he had the intent to kill Mr. Holman. However, this fact is *not* alone in the analysis. Rather, as identified above, the record is replete with evidence establishing the essential elements of attempted first degree murder, including that the Defendant's conscious objective or desire was to kill a person. We conclude that the evidence is sufficient to sustain the Defendant's conviction for the attempted first degree murder of Mr. Holman.

## CONCLUSION

In summary, we hold that the evidence, when viewed in the light most favorable to the State and with all reasonable inferences drawn in the State's favor, is sufficient to support the jury's finding of the essential elements of the crimes of first degree murder and attempted first degree murder. As such, we conclude that the evidence supports the Defendant's convictions for each of these offenses, and we affirm the judgments of the trial court.

_____
TOM GREENHOLTZ, JUDGE